Exhibit 3

## *Monster Energy Co. v. Chen Wensheng*

United States District Court for the Northern District of Illinois, Eastern Division

September 29, 2015, Decided; September 29, 2015, Filed

Case No. 15 C 4166

**Reporter**

136 F. Supp. 3d 897 *; 2015 U.S. Dist. LEXIS 132283 **

MONSTER ENERGY COMPANY, Plaintiff, v. CHEN WENSHENG, et al., Defendants.

## Core Terms

counterfeit, Products, Energy, personal jurisdiction, Internet, residents, forum state, defendants', shipping, offer to sell, injunction, interactive, buyers, infringing, minimum contact, tortious act, contacts, sales, aiming, courts, trademark infringement, exhibits, Target, online, mqxxc, traditional notions of fair play, preliminary injunction, substantial justice, do business, consumers

## Case Summary

### Overview

HOLDINGS: [1]-In this Lanham Act action, defendants' offers to sell counterfeit products on their Internet stores constituted tortious activity committed in Illinois sufficient to establish personal jurisdiction over both defendants in this court because in creating their online stores, defendants affirmatively selected a shipping template to ship counterfeit products to United States and Illinois residents; [2]-Plaintiff established that defendants knew that in targeting consumers in the United States the effects of its tortious acts would likely be felt in Illinois; [3]-Plaintiff's claims arose directly out of defendants' contacts with Illinois where plaintiff's claims arose out of defendants' forum-related activities and contacts with Illinois residents as defendants offered to sell counterfeit products on its Internet store to individuals with Illinois addresses.

### Outcome

Defendants' motion denied.

## LexisNexis® Headnotes

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Challenges

Evidence > Burdens of Proof > Allocation

Civil Procedure > Pleading & Practice > Motion Practice

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

***HN1***[⤓] **In Personam Actions, Challenges**

*Fed. R. Civ. P. 12(b)(2)* permits dismissal of a claim based on lack of personal jurisdiction over the defendant. *Fed. R. Civ. P. 12(b)(2)*. The party asserting personal jurisdiction bears the burden of proof. When the court rules on the motion without a hearing, the plaintiff need only establish a prima facie case of personal jurisdiction. The court will read the complaint liberally, in its entirety, and with every inference drawn in favor of the plaintiff. Jurisdictional allegations pled in the complaint are accepted as true unless proved otherwise by affidavits or exhibits. But once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction. If any conflicts arise between the plaintiff's complaint (or supporting materials) and the defendant's affidavits or evidence, the plaintiff is entitled to have those conflicts resolved in its favor.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Due Process

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Long Arm

Page 2 of 13

136 F. Supp. 3d 897, *897; 2015 U.S. Dist. LEXIS 132283, **132283

Jurisdiction

**HN2**[⬇] **In Personam Actions, Due Process**

Because neither the Lanham Act nor the Copyright Act authorizes nationwide service of process, a court sitting in Illinois may exercise jurisdiction over defendants only if authorized both by the United States Constitution and Illinois law. The Illinois long-arm statute permits its courts to exercise personal jurisdiction on any basis permitted by the constitutions of both Illinois and the United States. *735 ILCS 5/2-209(c)*. Accordingly, the state statutory and federal constitutional inquiries merge.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Due Process

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Long Arm Jurisdiction

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

**HN3**[⬇] **In Personam Actions, Due Process**

The key constitutional question is whether the defendants have sufficient "minimum contacts" with Illinois such that the suit does not offend traditional notions of fair play and substantial justice. That is to say, each defendant must have purposely established minimum contacts with the forum state such that he or she should reasonably anticipate being haled into court there. A defendant cannot avoid jurisdiction merely because the defendant did not physically enter the forum State. Indeed, as the U.S. Supreme Court has observed, a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. Nevertheless, potential defendants should have some control over—and certainly should not be surprised by—the jurisdictional consequences of their actions. The Due Process Clause gives some minimum assurance as to where that conduct will and will not render them liable to suit.

Civil Procedure > ... > In Rem & Personal

Jurisdiction > In Personam Actions > Long Arm Jurisdiction

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Substantial Contacts

**HN4**[⬇] **In Personam Actions, Long Arm Jurisdiction**

Under the Illinois long-arm statute, personal jurisdiction may be general or specific.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Due Process

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

**HN5**[⬇] **In Personam Actions, Due Process**

Specific jurisdiction grows out of the relationship among the defendant, the forum, and the litigation. Specific jurisdiction requires that (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Purposeful Availment

**HN6**[⬇] **In Personam Actions, Minimum Contacts**

Whether a defendant has purposefully directed activities at a forum depends in large part on the type of claim at issue. Where the plaintiff's claims are for intentional

Page 3 of 13

136 F. Supp. 3d 897, *897; 2015 U.S. Dist. LEXIS 132283, **132283

torts, the inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state. In this context, courts apply the "express aiming test" and look to whether the defendant engaged in (1) intentional conduct (or intentional and allegedly tortious conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state. The defendant's conduct and connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there. In other words, the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him.

Business & Corporate Compliance > ... > Trademark Law > Causes of Action Involving Trademarks > Infringement Actions

Trademark Law > Causes of Action Involving Trademarks > Counterfeiting

**HN7[⤓]** **Causes of Action Involving Trademarks, Infringement Actions**

Section 32 of the Lanham Act creates a civil right of action for trademark infringement and counterfeiting. Under the plain language of *15 U.S.C.S. § 1114*, an offer to sell an infringing or counterfeit item, even without any other activity, establishes liability for trademark infringement and counterfeiting. Displaying photos of an item for sale and inviting potential purchasers to place an order and buy the product through an Internet store is an offer for sale.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

**HN8[⤓]** **In Personam Actions, Minimum Contacts**

A defendant's intentional tort creates the requisite minimum contacts with a state only when the defendant expressly aims its actions at the state with the knowledge that they would cause harm to the plaintiff there. Courts have characterized the express aiming test to require a showing of "injury plus." That is, the

plaintiff must demonstrate not only that the defendant's tortious act injured him in the forum state, but that the defendant acted specifically to harm the plaintiff in the forum state.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

**HN9[⤓]** **In Personam Actions, Minimum Contacts**

Where a company holds itself out as open to do business with every state and is ready and willing to do business with that state's residents, specific jurisdiction over it is proper.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

**HN10[⤓]** **In Personam Actions, Minimum Contacts**

To establish minimum contacts a defendant must not only "expressly aim" its actions at the state but must do so with the knowledge that it would cause harm to the plaintiff there.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Due Process

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Long Arm Jurisdiction

**HN11[⤓]** **In Personam Actions, Due Process**

A court must consider whether the exercise of personal jurisdiction over defendants would offend traditional notions of fair play and substantial justice. The factors considered are the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. These factors rarely will justify a determination against personal jurisdiction.

Page 4 of 13

136 F. Supp. 3d 897, *897; 2015 U.S. Dist. LEXIS 132283, **132283

Civil Procedure > ... > Jurisdiction > In Rem & Personal Jurisdiction > In Personam Actions

Civil Procedure > Remedies > Provisional Remedies

#### HN12[🔽] In Rem & Personal Jurisdiction, In Personam Actions

Once personal jurisdiction of a party is obtained, the district court has authority to order it to "freeze" property under its control, whether the property be within or without the United States.

Civil Procedure > Remedies > Provisional Remedies

Evidence > Burdens of Proof > Allocation

#### HN13[🔽] Remedies, Provisional Remedies

To exempt assets from an asset freeze, the burden is on the party seeking relief to present documentary proof that particular assets are not the proceeds of counterfeiting activities.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

#### HN14[🔽] Injunctions, Preliminary & Temporary Injunctions

Under *Fed. R. Civ. P. 65(c)*, a court may issue a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. *Fed. R. Civ. P. 65(c)*. The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him. The appropriate amount of the bond is subject to the court's discretion. *Fed. R. Civ. P. 65(c)*. But, because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, the court of appeals has stated that district courts should err on the high side when setting a bond.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Evidence > Burdens of Proof > Allocation

#### HN15[🔽] Injunctions, Preliminary & Temporary Injunctions

A party may move the court to increase or decrease the amount of security so long as the restraint or injunction is in effect. The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint.

**Counsel:** [**1] For Monster Energy Company, Plaintiff: Kevin W. Guynn, LEAD ATTORNEY, Amy Crout Ziegler, Jessica Lea Bloodgood, Justin R. Gaudio, Greer, Burns & Crain, Ltd., Chicago, IL.

For Daimen Liang, doing business as Best Car Wrap Ltd., store at aliexpress.com/store/734633 (hits #256,257), Jack Zhang, doing business as Neon Factory Sales, store at aliexpress.com/store/1202603(hit#2?), Defendants: John R. Crossan, Crossan Intellectual Property Law, LLC, Chicago, IL.

For Legend Trading Co., LTD, Zhang Yuan, Defendants: Keith A. Vogt, LEAD ATTORNEY, Oak Park, IL.

For Wong Raymond Wai Man, Defendant: Ramon Kumar Singh, Internal Revenue Service, Chicago, IL.

**Judges:** Joan Humphrey Lefkow, U.S. District Judge.

**Opinion by:** Joan Humphrey Lefkow

## Opinion

### [*900] OPINION AND ORDER

On May 12, 2015, Monster Energy Company (MEC) filed suit against Chinese entities that have offered counterfeit Monster Energy products for sale online ("defendants")[1] alleging trademark counterfeiting and

---

[1] Defendants are operating the Online Marketplace Accounts and Defendant Domain Names listed in Amended Schedule A to the Second Amended Complaint. *See* dkt. 53. After MEC

Page 5 of 13

136 F. Supp. 3d 897, *900; 2015 U.S. Dist. LEXIS 132283, **1

copyright infringement. (Dkt. 1.) MEC's five-count second amended complaint brings claims for (1) willful trademark infringement and counterfeiting in violation of *section 32 of the Lanham Act*, *15 U.S.C. § 1114*; (2) willful false designation of origin in violation of *section 43 of the Lanham Act*, *15 U.S.C. § 1125*; (3) willful [**2] cybersquatting in violation of *section 43(d) of the Lanham Act*, *15 U.S.C. § 1125(d)*; (4) willful violation of [*901] the Illinois Uniform Deceptive Trade Practices Act, *815 ILCS § 510 et seq.*; and (5) deliberate copying of MEC's copyrighted designs in violation of the Copyright Act, *17 U.S.C. § 501(a)*. (Dkt. 53 (Second Am. Compl.) ¶¶ 34-62.) On May 20, 2015, the court entered a temporary restraining order (TRO) freezing defendants' PayPal accounts. (Dkt. 22.) The court converted the TRO to a preliminary injunction on May 27, 2015. (Dkt. 33.) Two defendants, Wu Zou d/b/a the Internet Store Legend Trading Co., Ltd. ("Legend Trading") and Zhang Yuan d/b/a Internet Store mqxxc, have moved to dismiss for lack of personal jurisdiction under *Federal Rule of Civil Procedure 12(b)(2)* and to release the frozen funds. (Dkts. 50, 57.) For the reasons stated below, defendants' motions are denied.[2]

## BACKGROUND[3]

In 2002, MEC launched its MONSTER ENERGY® brand of drinks bearing its now famous MONSTER ENERGY mark and design. (Second Am. Compl. ¶ 5.) MEC is the owner of numerous valid trademarks. (*Id.* at 14-15.) In addition to its MONSTER™ line of energy drinks, MEC uses its Claw Icon mark, MONSTER™ mark, MONSTER ENERGY® mark, and has copyrighted designs in connection with a large variety of products, including stickers, helmets, sports gear, clothing items, headgear, and sports bags (the Monster Energy Products). (*Id.* ¶ 8; *see also* dkt. 88 (Kingsland

---

filed its most recent amended complaint, it voluntarily dismissed numerous defendants (*see* dkts. 62, 63, 64, 67, 71, 75, 81, 100) and the court ordered the dismissal of those defendants (*see* dkts. 66, 103).

[2] The court has jurisdiction under *28 U.S.C. §§ 1331* and *1367(a)*. Venue is [**3] proper in this district under *28 U.S.C. § 1391(b)*.

[3] Unless otherwise noted, the following facts are taken from the second amended complaint "with every inference drawn in favor" of the plaintiff. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reins. Co., 440 F.3d 870, 878 (7th Cir.2006)* (quoting *Textor v. Bd. of Regents of N. Ill. Univ., 711 F.2d 1387, 1393 (7th Cir.1993))*.

Dec.) ¶ 4.) Due to its substantial and continuous marketing and promotion, MEC's MONSTER™ family products have achieved substantial commercial success, with estimated retail sales exceeding $5 billion per year worldwide. (*See* Second Am. Compl. ¶ 13.) MEC has also sold millions of dollars' worth of MEC's MONSTER™ family of products to Illinois residents through brick and mortar accounts such as 7-Eleven, Walmart, Costco, Sam's Club, CVS, Target, and Circle K, to [**4] name a few. (Kingsland Dec. ¶ 7.) The success of the Monster Energy brand has resulted in its significant counterfeiting, giving rise to the present claims. (*See* Second Am. Compl. ¶ 25.)

Legend Trading and mqxxc created and operated commercial, fully interactive Internet stores on the global marketplace AliExpress.com (AliExpress). (*Id.* ¶ 23; *see also* dkts. 87 at 3, 89 ¶ 2, 92 at 3, 94 ¶ 2.) AliExpress is an English language global retail marketplace for Chinese sellers to target and sell to consumers worldwide. (Dkts. 87 at 3, 92 at 3; *see also* dkts. 89, 94 (collectively, Martin Decs.) ¶ 5.) Through AliExpress, Chinese sellers learn techniques for targeting United States buyers. (Dkt. 90, 95 (collectively, Fu Decs.) ¶¶ 21-22.)

Each defendant through its Internet store targets and offers to sell counterfeit Monster Energy Products to consumers within the United States, including Illinois. (Second Am. Compl. ¶ 23.) Defendants' offers to sell consist of displaying photographs of counterfeit Monster Energy Products and inviting potential buyers to buy products through their Internet stores. Then, defendants have the ordered items shipped to the United States. (*See id.* 35-36; *see also* Martin Decs. [**5] ¶ 6.) In creating their online stores, defendants [*902] affirmatively select a shipping template to ship their products, including counterfeit Monster Energy Products, to the United States and Illinois. (*See id.*; *see also* Martin Decs. ¶¶ 7-8; Fu Decs. ¶¶ 3-14.)

## ANALYSIS

## I. Personal Jurisdiction

## A. Legal Standard

*HN1*[⬆] *Rule 12(b)(2)* permits dismissal of a claim based on lack of personal jurisdiction over the defendant. *See* *Fed. R. Civ. P. 12(b)(2)*. The party

Page 6 of 13

136 F. Supp. 3d 897, *902; 2015 U.S. Dist. LEXIS 132283, **5

asserting personal jurisdiction bears the burden of proof. See *Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)*. When the court rules on the motion without a hearing, the plaintiff need only establish a "*prima facie* case of personal jurisdiction." *Id.* (quoting *Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 713 (7th Cir. 2002))*. The court will "read the complaint liberally, in its entirety, and with every inference drawn in favor" of the plaintiff. *Cent. States, 440 F.3d at 878* (quoting *Textor, 711 F.2d at 1393*). Jurisdictional allegations pled in the complaint are accepted as true unless proved otherwise by affidavits or exhibits. See *Purdue Research Found., 338 F.3d at 782*. But "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id. at 783*. If any conflicts arise between the plaintiff's complaint (or supporting materials) **[**6]** and the defendant's affidavits or evidence, the plaintiff is entitled to have those conflicts resolved in its favor. *Id*.

## B. Court's Review of Personal Jurisdiction

Plaintiff asserts claims under the *Lanham Act*, Copyright Act, and Illinois statutory law. **HN2**[⬆] Because neither the *Lanham Act* nor the Copyright Act authorizes nationwide service of process, a court sitting in Illinois may exercise jurisdiction over defendants only if authorized by the United States Constitution and Illinois law. *be2 LLC v. Ivanov, 642 F.3d 555, 558 (7th Cir. 2011)* (citing *Fed. R. Civ. P 4(k)(1)(A)* and stating that the *Lanham Act* does not authorize nationwide service); *Tamburo v. Dworkin, 601 F.3d 693, 700 (7th Cir. 2010)* (same); *Janmark, Inc. v. Reidy, 132 F.3d 1200, 1201 (7th Cir. 1997)* (Copyright Act does not authorize nationwide service), *abrogated on other grounds by Advanced Tactical Ordnance, LLC v. Real Action Paintball, Inc., 751 F.3d 796 (7th Cir. 2014)*. The Illinois long-arm statute "permits its courts to exercise personal jurisdiction on any basis permitted by the constitutions of both Illinois and the United States." *Id*.; *735 Ill. Comp. Stat. 5/2-209(c)*. Accordingly, "the state statutory and federal constitutional inquiries merge." *Tamburo, 601 F.3d at 700*.

**HN3**[⬆] The key constitutional question is whether the defendants have sufficient "minimum contacts" with Illinois such that the suit "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)* (internal quotations marks omitted).

That is to say, each defendant **[**7]** must have purposely established minimum contacts with the forum state such that he or she "should reasonably anticipate being haled into court" there. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (quotation marks omitted). A defendant cannot avoid jurisdiction "merely because the defendant did not *physically* enter the forum State." *Id. at 476*. Indeed, as the Supreme Court has observed, "a substantial **[*903]** amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id*. Nevertheless, "[p]otential defendants should have some control over—and certainly should not be surprised by—the jurisdictional consequences of their actions." *RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1278 (7th Cir.1997)*. The *Due Process Clause* "gives some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*.

**HN4**[⬆] Under the Illinois long-arm statute, personal jurisdiction may be general or specific. *uBid, Inc. v. GoDaddy Grp., Inc., 623 F.3d 421, 425 (7th Cir. 2010)*. MEC does not argue that the court has general jurisdiction. Accordingly, the court turns to whether it has specific jurisdiction over defendants.

### 1. Specific Jurisdiction

**HN5**[⬆] Specific jurisdiction grows out of "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore, ___ U.S. ___, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)* (quoting *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984))*. Specific jurisdiction **[**8]** requires that "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *N. Grain Mktg., LLC v. Greving, 743 F.3d 487, 492 (7th Cir. 2014)* (quoting *Tamburo, 601 F.3d at 701*). "The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *Id*. (citing *Tamburo, 601 F.3d at 702*).

### a. Minimum Contacts - Whether Defendant's Activities Were Purposefully Directed At Illinois

Page 7 of 13

136 F. Supp. 3d 897, *903; 2015 U.S. Dist. LEXIS 132283, **8

*HN6*[↑] Whether a defendant has purposefully directed activities at a forum "depends in large part on the type of claim at issue." *Felland v. Clifton, 682 F.3d 665, 674 (7th Cir.2012)*. Where the plaintiff's claims are for intentional torts, as here,[4] the inquiry "focuses on whether the conduct underlying the claims was purposely directed at the forum state." *Id. at 674* (quoting *Tamburo, 601 F.3d at 702*). In this context, courts apply the "express aiming test" and look to whether the defendant engaged in "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo, 601 F.3d at 703* (citing *Calder v. Jones, 465 U.S. 783, 789-90, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984))*.[5] "The **[*904]** defendant's conduct and **[**9]** connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there." *N. Grain Mktg., 743 F.3d at 492*. In other words, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden, 134 S. Ct. at 1122* (citations omitted).

**i. Intentional and Tortious Conduct**

---

[4] "Infringement of a trademark is a tort." *Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1388 (8th Cir.1991)*; *see also Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1353 (11th Cir. 2013)*; *Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 171 (2d Cir.2010)* ("Trademark infringement is ... a tort."); *Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 720 (9th Cir.2004)* ("[T]rademark infringement generally sounds in tort.").

[5] Courts have applied the *Calder* "express aiming test" in cases involving intentional torts, including trademark infringement. *See, e.g., Medline Indus., Inc. v. Strategic Commercial Sols., Inc., 553 F. Supp. 2d 979 (N.D. Ill. 2008)*; *Euromarket Designs, Inc. v. Crate & Barrel Ltd., 96 F. Supp. 2d 824 (N.D. Ill. 2000)*; *see also Virgin Enters. Ltd. v. Jai Mundi, Inc., No.13 C 8339, 2014 U.S. Dist. LEXIS 98437, 2014 WL 3605541, at *5 (N.D. Ill. July 18, 2014)* (explaining that it was unnecessary to apply *Calder's* express aiming test in this trademark infringement case because defendant's "actual (as opposed to imputed) contacts with Illinois were sufficient to support the exercise of specific personal jurisdiction").

*HN7*[↑] *Section 32* of the Lanham Act creates a civil right of action for trademark infringement and counterfeiting. Under the plain language of *15 U.S.C. § 1114*, an offer to sell an infringing or counterfeit item, even without **[**10]** any other activity, establishes liability for trademark infringement and counterfeiting. *Levi Strauss v. Shilon, 121 F.3d 1309, 1312 (9th Cir. 1997)*; *Chloe SAS v. Sawabeh Information Servs. Co., No. cv 11-04147, 2014 U.S. Dist. LEXIS 124433, 2014 WL 4402218, at *6 (C.D. Cal. Sept. 5, 2014)*. Displaying photos of an item for sale and inviting potential purchasers to place an order and buy the product through an Internet store is an offer for sale. *See Milo & Gabby, LLC v. Amazon.com, No. C13-1932, 2015 U.S. Dist. LEXIS 92890, 2015 WL 4394673, at *14 (W.D. Wash. July 16, 2015)*; *cf. MEMC Elec. Materials Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1376 (Fed. Cir. 2005)* (concluding that letters that conveyed "a description of the allegedly infringing merchandise and the price at which it can be purchased" could be regarded as an "offer to sell" under *35 U.S.C. § 271(a)*).

Here, one of MEC's numerous exhibits filed with the court illustrate that Legend Trading made an offer to sell when it displayed photos of biker gloves with Monster Energy's trademark for sale at $8.99 with 8991 pieces and three colors available on its Internet store. (*See* dkt. 27-7.; *see also* Martin Decs. ¶ 10.) Similarly, another one of MEC's exhibits illustrates that mqxxc made an offer to sell when it displayed photos of Monster Energy graphic sticker decals for sale at $39.99 with 999 pieces available on its Internet store. (*See* dkt. 27-8; *see also* Martin Decs. ¶ 10.) Defendants invite potential purchasers to place orders and buy products through their Internet stores, and MEC's **[**11]** exhibits show that at least two individuals, Lisa Cho and Gigi Ah, with Illinois shipping addresses attempted to purchase counterfeit Monster Energy biker gloves from Legend Trading, and at least one individual, Tyronn Chen, with an Illinois shipping address attempted to purchase counterfeit Monster Energy sticker decals from mqxxc. (*See* dkts. 27-7, 27-8; *see also* Martin Decs. ¶¶ 7, 10, 11.) MEC's Exhibit 2-17 also includes an email conversation between Ah and Zou in which Zou provides Ah with Legend Trading's PayPal account and indicates that she can pay for her order via PayPal. (*See* dkts. 27-7; *see also* Martin Decs. ¶ 11.) Similarly, MEC's Exhibit 2-18 includes a conversation between Chen and Yuan in which Yuan provides Chen with mqxxc's PayPal account number and indicates that Chencan pay for the Monster decal stickers via a specific PayPal account. (*See* dkts. 27-8; *see also* Martin Decs. ¶ 11.) As such, defendants' offers to sell

Page 8 of 13

136 F. Supp. 3d 897, *904; 2015 U.S. Dist. LEXIS 132283, **11

counterfeit Monster Energy Products on their Internet stores constitute tortious activity committed in Illinois sufficient to establish personal jurisdiction over both defendants in this court. *See Dental Arts Lab., Inc. v. Studio 360 The Dental Lab, LLC, No. 10 C 4535, 2010 U.S. Dist. LEXIS 124029, [\*905] 2010 WL 4877708, at \*7 (N.D. Ill. Nov. 23, 2010)* ("As long as one tortious act is committed in Illinois, **[\*\*12]** the courts of the state, and thus this Court, may exercise personal jurisdiction over Defendant."); *see also Steuben Foods, Inc. v. Oystar USA, 2012 U.S. Dist. LEXIS 70638, 2012 WL 1854642, at \*2 (W.D.N.Y. May 21, 2012)* (citing to *Houbigant, Inc. v. ACB Mercantile, Inc., 914 F. Supp. 964, 979-80 (S.D.N.Y 1995)* ("Offering one copy of an infringing work for sale in New York, even if there is no actual sale, constitutes commission of a tortious act within the state sufficient to imbue this Court with personal jurisdiction.").

## ii. Express Aiming at the Forum State

*HN8*[↑] ] "[A] defendant's intentional tort creates the requisite *minimum contacts* with a state only when the defendant *expressly aims* its actions at the state with the knowledge that they would cause harm to the plaintiff there." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A., 623 F.3d 440, 445 (7th Cir. 2010)* (emphasis added). This court has characterized the express aiming test to require a showing of "injury plus." *Telemedicine Solutions LLC v. WoundRight Techs., LLC, 27 F. Supp. 3d 883, 895 (N.D. Ill. Mar. 14, 2014)*. That is, the plaintiff must demonstrate not only that the defendant's tortious act injured him in the forum state, but that the defendant acted specifically to harm the plaintiff in the forum state. *See id*.

Citing *Alcar Group, Inc. v. Corporate Performance Sys., 109 F. Supp. 2d 948, 949 (N.D. Ill. 2000)*, defendants argue that infringing sales abroad via their websites do not create the necessary minimum contacts since the *Lanham Act* has no extraterritorial reach. Defendants' contentions wholly disregard MEC's claim that defendants offered to sell counterfeit Monster Energy Products **[\*\*13]** to individuals with Illinois shipping addresses, rather than alleging sales by defendants abroad. In *Alcar Group*, the issue was whether the court had jurisdiction over a foreign citizen's *activity in a foreign country*. *Alcar Group, 109 F. Supp. 2d at 951*. Here, the issue is whether the court has personal jurisdiction over a foreign citizen's *activity in the United States*. As such, *Alcar Group* is inapposite.

Defendants also argue that their interactive websites alone are not sufficient to establish minimum contacts. (Dkt. 51 at 3 (quoting *Advanced Tactical, 751 F.3d at 803* ("The operation of an interactive website does not show that the defendant has formed a contact with the forum state.")).) MEC does not dispute that an interactive website alone would be insufficient but argues that defendants created and operated interactive Internet stores and affirmatively selected a shipping option to ship counterfeit Monster Energy Products to the United States, including to Illinois residents. (Martin Decs. ¶¶ 7-8.) As such, MEC argues that the facts here are directly analogous to *Illinois v. Hemi Group, LLC, 622 F.3d 754 (7th Cir. 2010)*. (Dkt. 87 at 10.) The court agrees.

In *Hemi Group*, the defendant was sued by the State of Illinois for selling cigarettes to Illinois residents in violation of federal and state law. **[\*\*14]** *Hemi Grp. LLC, 622 F.3d at 755*. The court in *Hemi Group* found that it had personal jurisdiction over defendants because they operated a nationwide business model where they intentionally created and operated several commercial, interactive websites to offer products for sale and allow online orders from Illinois residents. *Hemi Grp. LLC, 622 F.3d at 757-58*. The Seventh Circuit explained that, "[a]lthough listing all forty-nine states by name would have made a stronger case for jurisdiction in **[\*906]** this case, . . . the net result is the same—Hemi stood ready and willing to do business with Illinois residents." *Id. at 758*. As such, the court held that specific jurisdiction is proper where a company "h[olds] itself out as open to do business with every state" and is "ready and willing to do business with [that state's] residents."

Similarly, in this case, defendants intentionally created and operated commercial, fully interactive AliExpress Internet stores through which consumers can purchase counterfeit Monster Energy Products. In creating their online stores, defendants affirmatively selected a shipping template to ship counterfeit Monster Energy Products to United States and Illinois residents. (Martin Decs. ¶¶ 7-8; *see also* Fu Decs. ¶¶ 3-14.) As a result, defendants expressly **[\*\*15]** elected to do business with the residents of all fifty states, including Illinois. *See Hemi Grp. LLC, 622 F.3d at 758*; *see also uBid, 623 F.3d at 428* ("[I]t is easy to infer that GoDaddy's national marketing campaign is intended to reach as large an audience as possible, including the 13 million potential customers in the nation's fifth most populous state [(Illinois).]")

Defendants also argue that the court lacks personal

Page 9 of 13

136 F. Supp. 3d 897, *906; 2015 U.S. Dist. LEXIS 132283, **15

jurisdiction because no sale was made to an Illinois resident (Dkt. 52 ¶ 7; Dkt. 59 ¶ 5), and MEC has presented no evidence that either Cho or Chen is even located in Illinois. (Dkt. 51 at 4.) First, as indicated above, an offer to sell infringing or counterfeit items establishes liability for trademark infringement, a tortious act, and "[a]s long as one tortious act is committed in Illinois the courts of the state, and thus this Court, may exercise personal jurisdiction over Defendant," *Dental Arts Lab., 2010 U.S. Dist. LEXIS 124029, 2010 WL 4877708, at \*7*. As such, defendants did not need to complete a sale to imbue Illinois courts with personal jurisdiction. Second, there is no requirement that MEC or the person placing the order reside in Illinois in order for this court to have jurisdiction over defendants. *Walden, 134 S. Ct. at 1121-22* ("The inquiry whether a forum State may assert specific jurisdiction over [**16] a nonresident defendant focuses on 'the relationship among the defendant, the forum, and the litigation.' . . . [O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.") MEC's claims against defendants are based on defendants' offers to sell counterfeit Monster Energy products through their interactive Internet store, which allows online orders to be placed and shipped to Illinois addresses. MEC, through its exhibits and affidavits, has alleged that at least on one occasion Zou (on behalf of Legend Trading) communicated with a buyer who had placed an order to purchase counterfeit Monster Energy Products, asked the buyer for the order number which clearly reflected an Illinois shipping address, and provided his PayPal account number for the buyer to make the payment for the item. (*See* Dkt. 27-7; *see also* Martin Decs. ¶ 11.) Similarly, MEC's exhibits and affidavits allege that at least on one occasion Yuan (on behalf of mqxxc) communicated with a buyer who wished to place an order on counterfeit Monster sticker decals and provided his PayPal account number for the buyer to purchase the item. **[**17]** (*See* dkt. 27-8; *see also* Martin Decs. ¶ 11.) It is these tortious acts on which MEC basis its argument that Illinois has specific jurisdiction. *See Dental Arts Lab., 2010 U.S. Dist. LEXIS 124029, 2010 WL 4877708, at \*7* ("As long as one tortious act is committed in Illinois, the courts of the state, and thus this Court, may exercise personal jurisdiction over Defendant.")

Defendants also claim that it is insufficient to rely on defendants' "random, **[\*907]** fortuitous, or attenuated contacts" or on the "unilateral activity" of MEC. (Dkt. 51 at 5.) First, Legend Trading's actions are not "random, fortuitous, or attenuated contacts." It is true that in the

Internet context, there is no specific jurisdiction where the defendant's contacts with the forum state are "entirely fortuitous." *Advanced Tactical, 751 F.3d at 803* (no specific personal jurisdiction over defendant that maintained email list allowing it to send email to past customers, even though some happened to be in forum state). But *HN9*[↑] where a company "h[olds] itself out as open to do business with every state" and is "ready and willing to do business with [that state's] residents," specific jurisdiction over it is proper. *Hemi Grp. LLC, 622 F.3d at 758* (internet seller of cigarettes subject to specific personal jurisdiction in Illinois where Illinois residents purchase cigarettes [**18] online and seller then shipped cigarettes to Illinois); *see also Valtech, LLC v. 18th Ave. Toys Ltd., No. 14 C 134, 2015 U.S. Dist. LEXIS 17138, 2015 WL 603854, at \*4 (N.D. Ill. Feb. 12, 2015)*; *Payton v. Kale Realty, No. 13 C 8002, 2014 U.S. Dist. LEXIS 118590, 2014 WL 4214917, at \*4 (N.D. Ill. Aug. 26, 2014)*. Moreover, in 2011 the court in *Deckers Corp. v. Does 1-500* found that personal jurisdiction existed over China-based defendants operating commercial, interactive Internet stores to offer to sell and to sell counterfeit products to the United States, including Illinois. *Deckers Corp. v. Does 1-55, No. 1:11 CV 00010, 2011 U.S. Dist. LEXIS 119448, 2011 WL 4929036, at \*3 (N.D. Ill. Oct. 14, 2011)*. Since *Deckers Corp.*, numerous cases, within this district alone, have exercised jurisdiction over defendants operating commercial, interactive Internet stores offering to sell counterfeit products to the United States, including Illinois. (*See* dkt. 87 at 8; Martin Decs. ¶ 14.)

Second, it is misleading to classify the offer to sell as a "unilateral activity" by the plaintiff. *See Hemi Grp. LLC, 622 F.3d at 758*. In *Hemi Group*, the court explained that

> [c]haracterizing the sales as unilateral is misleading, . . . because it ignores several of Hemi's own actions that led up to and followed the sales. . . . It is Hemi reaching out to residents of Illinois, and not the residents reaching back, that created the sufficient minimum contacts with Illinois that justify exercising personal jurisdiction over Hemi in Illinois.

*Id.* Here, defendants **[**19]** intentionally created and operated commercial, fully interactive Internet stores and affirmatively selected a shipping template to ship counterfeit Monster Energy Products to United States and Illinois residents. (Martin Decs. ¶¶ 7-8.) Further, MEC provides exhibits that include conversations in which defendants provide Illinois buyers with their

Page 10 of 13

136 F. Supp. 3d 897, *907; 2015 U.S. Dist. LEXIS 132283, **19

PayPal account information in order to complete their purchase. (Dkts. 27-7, 27-8.) Thus, it was defendants' reaching out to Illinois residents that created the sufficient minimum contacts with Illinois.

Defendants further argue that "the alleged offer is invalid since it was induced by fraud" and that the MEC "cannot point to a single valid offer to sell an infringing product into Illinois." (Dkt. 51 at 5.) Defendants' argument completely misses the mark. Here, MEC claims that defendants committed tortious acts by offering to sell counterfeit Monster Energy Products and that such offers to sell took place the moment defendants displayed photographs of counterfeit Monster Energy Products for sale and invited potential buyers, including Illinois buyers, to place orders and buy products through their Internet stores. *See* *Milo & Gabby, 2015 U.S. Dist. LEXIS 92890, 2015 WL 4394673, at *14*. Defendants do not provide **[\*\*20]** any evidence to suggest that they were induced by fraud to post images of counterfeit Monster Energy Products and **[\*908]** invite potential Illinois buyers to place orders and buy counterfeit products.

Lastly, defendants attempt to analogize this case to *Advanced Tactical*. There, the Seventh Circuit found that "it [was] unlikely that those few sales alone, without some evidence *linking* them to the allegedly tortious activity, would make jurisdiction proper." *Advanced Tactical, 751 F.3d at 801*. In other words, plaintiff provided "no evidence that those sales had any connection with this litigation." *Id*. By contrast, here, MEC provides evidence that defendants offered to sell counterfeit Monster Energy Products, *see* dkts. 27-7, 27-8, and MEC bases its claims on that specific tortious conduct of "offering to sell" counterfeit product in violation of the *Lanham Act*. Based on MEC's affidavits and supporting materials, the court finds Legend Trading expressly aimed its action at Illinois.

### iii. Defendant's Knowledge That the Effects Would be Felt in the Forum State

*HN10*[⬆] To establish minimum contacts a defendant must not only "expressly aim" its actions at the state but must do so "with the knowledge that [it] would cause harm to the plaintiff **[\*\*21]** there." *Mobile Anesthesiologists Chicago, 623 F.3d at 445*. Here, the Director of Global Brand Protection & Corporate Investigations of Monster Energy Company, Bruce Kingsland, proffers that MEC uses its registered trademarks and copyrights on and in connection with

the creation and distribution of a large variety of products, including but not limited to, energy drinks, stickers, clothing items, helmets, headgear, sports gear, and sports bags. (Kingsland Dec. ¶ 4.) Kingsland also states that "millions of dollars' worth of MEC's MONSTER™ family of products have been sold to Illinois residents through brick and mortar accounts such as 7-Eleven, Walmart, Costco, Sam's Club, CVS, Target, and Circle K, to name a few." (*Id*. ¶ 7.) Based on MEC's considerably large sales in Illinois, the fact that Illinois is the fifth most populous state, and the fact that counterfeit sales lower the market share of the rights holder, MEC has established by a preponderance of the evidence that defendants knew that in targeting consumers in the United States the effects of its tortious acts would likely be felt in Illinois.

### b. Relatedness - Whether MEC's Claim Arose Out Of Such Activities

The court's conclusion that defendants' conduct was "purposely directed" **[\*\*22]** at Illinois does not end the jurisdictional inquiry. For the court to exercise specific jurisdiction over defendants, MEC's claims must "arise out of" or "relate to" defendants' contacts with Illinois. *RAR, Inc., 107 F.3d at 1277-78*. This requirement is satisfied here. As in *Hemi Group*, MEC's claims arise out of defendants' forum-related activities and contacts with Illinois residents. Defendants offered to sell counterfeit Monster Energy Products on its AliExpress Internet store to individuals with Illinois addresses. Such actions constitute tortious activity committed in Illinois, and defendants' actions surrounding those offers triggered MEC's claims against it. Accordingly, MEC's claims arise directly out of the defendants' contacts with Illinois.

### c. Fairness - Whether Specific Jurisdiction is Consistent with Traditional Notions of Fair Play and Substantial Justice

Finally, *HN11*[⬆] the court must consider whether the exercise of personal jurisdiction over defendants would offend traditional notions of fair play and substantial justice. *See* **[\*909]** *N. Grain Mktg., 743 F.3d at 492* (quoting *Int'l Shoe, 326 U.S. at 316*). The factors considered are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective **[\*\*23]** relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the

Page 11 of 13

136 F. Supp. 3d 897, *909; 2015 U.S. Dist. LEXIS 132283, **23

shared interest of the several States in furthering fundamental substantive social policies." *Felland, 682 F.3d at 677* (quoting *Burger King, 471 U.S. at 477*). "These factors rarely will justify a determination against personal jurisdiction." *Purdue Research Found., 338 F.3d at 781 n.10*.

While defendants may be burdened by having to defend an action in this state, "out-ofstate defendants *always* face such a burden." *Felland, 682 F.3d at 677* (emphasis in original). Notably, despite any potential claims of hardship, defendants have already retained local counsel and engaged in motion practice in this court. *See Jackson v. N'Genuity Enterprises, Co., 2014 U.S. Dist. LEXIS 119778, 2014 WL 4269448 (2014)* (finding, in part, that exercising personal jurisdiction over the defendant did not run afoul of traditional notions of fair play and substantial justice where the defendant had been litigating the related 2009 suit in this forum and had retained attorneys in the forum). Moreover, modern transportation and communications have made it much less burdensome for a party to defend itself in a state where he derives economic benefits, and it usually will not be unfair to subject him to the burdens of litigating in another forum. *Burger King, 471 U.S. at 474*. Furthermore, Illinois has an interest in protecting Illinois [**24] consumers from being deceived into purchasing counterfeit Monster Energy Products. Thus, exercising personal jurisdiction over defendants does not run afoul of traditional notions of fair play and substantial justice.

## II. Freezing of Property under Party's Control

*HN12*[↑] "Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control, whether the property be within or without the United States." *United States v. First Nat. City Bank, 379 U.S. 378, 384, 85 S. Ct. 528, 13 L. Ed. 2d 365 (1965)*; *see also Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 129 (2d Cir. 2014)*; *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C. v. Kovalic, No. 94-2545, 1995 U.S. App. LEXIS 15636, 1995 WL 375869, at *2 (7th Cir. 1995)*; *Fed. Trade Comm'n v. Windermere Big Win Int'l, Inc., No. 98 C 8066, 1999 U.S. Dist. LEXIS 12259, 1999 WL 608715, at *4 (N.D. Ill. Aug. 5, 1999)*. On issuing the TRO and preliminary injunction in this case, the court found that it had personal jurisdiction over defendants "since the defendants directly target their business activities towards consumers in the United States, including Illinois." (*See* dkts. 22, 33.) On reviewing defendants'

motion to dismiss for lack of personal jurisdiction, this court once again has concluded that it has personal jurisdiction over defendants. As such, the funds contained in defendants' PayPal accounts will remain frozen. *See Lorillard Tobacco Co. v. Montrose Wholesale Candies, 2005 U.S. Dist. LEXIS 28917, 2005 WL 3115892, at *13 (N.D. Ill. Nov. 8, 2005)* (citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 325, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999)*).

## A. Dissolving the Injunction and Funds Unrelated to Infringement

Defendants argue that even if this court has personal jurisdiction to freeze its assets, the court should dissolve the injunction **[**25]** because MEC cannot show likelihood of success on the merits or irreparable harm. (Dkts. 51 at 7, 58 at 6-7.) This court, however, already found that MEC **[*910]** showed a likelihood of success on the merits and irreparable harm. (Dkt. 33 at 5.) Defendants have not provided evidence to counter such a finding, and thus, this court will not dissolve the injunction.

Defendants also argue that the court should modify the injunction to limit the seizure to an amount corresponding to the products alleged to have been offered for sale, rather than the seizure of their entire PayPal account. (Dkts. 51 at 10, 58 at 9-10.) The court declines to modify the injunction at this time. *HN13*[↑] To exempt assets from an asset freeze, "[t]he burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of counterfeiting activities." *Luxottica USA LLC v. The Partnerships, et al., No. 1:14-cv-09061, 2015 U.S. Dist. LEXIS 78961, 2015 WL 3818622 (N.D. Ill. June 18, 2015)* (citing *N. Face Apparel Corp. v. TC Fashions, Inc., No. 05 CIV. 9083(RMB), 2006 U.S. Dist. LEXIS 14226, 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006)*). Defendants have not submitted any evidence regarding their PayPal account transactions to show that these funds are not the proceeds of counterfeiting activities.

## B. Increasing Bond Amount

Defendants also argue that even if the court does not dissolve the injunction, it should **[**26]** require MEC to post a larger bond in the amount of at least $5,000 per defendant. Defendants argue that the court should

Page 12 of 13

136 F. Supp. 3d 897, *910; 2015 U.S. Dist. LEXIS 132283, **26

increase the bond because they are one of hundreds of defendants whose businesses grounded to a halt the moment their PayPal accounts were frozen, and thus, the $10,000 bond the court previously ordered MEC to pay is insufficient. MEC responds that the court properly required MEC to post a bond of $10,000 because of the strong and unequivocal nature of MEC's evidence.

*HN14*[↑] Under *Federal Rule of Civil Procedure 65(c)*, a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Fed. R. Civ. P. 65(c)*. The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him. *Ty, Inc. v. Publications Intern. Ltd., 292 F.3d 512, 516 (7th Cir. 2002)*. The appropriate amount of the bond is subject to the court's discretion. *Fed. R. Civ. P. 65(c)*; *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis, 35 F.3d 1134, 1141 (7th Cir.1994)*. But, because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, the court of **[**27]** appeals has stated that district courts should err on the high side when setting a bond. *See Habitat Educ. Center v. U.S. Forest Serv., 607 F.3d 453, 456 (7th Cir.2010)*. On granting the TRO and preliminary injunction, the court ordered MEC to deposit $10,000 as security, an amount consistent with bonds required in similar cases. *See, e.g., Burberry Limited, et al. v. Su Sheng, et al.*, No. 1:15-cv-02851 (N.D. Ill. May 27, 2015) ($10,000 bond); *Beats Electronics, LLC v. The Partnerships, et al.*, No. 1:14-cv-05209 (N.D. Ill. Oct. 7, 2014) ($10,000 bond); *Calvin Klein Trademark Trust, et al. v. The Partnerships, et al.*, No. 1:13-cv-08186 (N.D. Ill. Jan. 14, 2014) ($10,000 bond); *True Religion Apparel, Inc. v. Does 1-100*, No. 12-cv-9894 (N.D. Ill. Dec. 20, 2012) ($10,000 bond); *Tory Burch LLC v. Zhong Feng, et al.*, No. 1:12-cv-09066 (N.D. Ill. Nov. 15, 2012) ($10,000 bond); *Deckers Outdoor Corp. v. Does 1-1,281*, No. 1:12-cv-01973 (N.D. Ill. Apr. 4, 2012) **[*911]** ($10,000 bond). Now, Legend Trading seeks to persuade the court that the bond amount should be increased.

*HN15*[↑] "A party may move the court to increase or decrease the amount of security so long as the restraint or injunction is in effect." 13 *Moore's Federal Practice—Civil § 65.50*; *see also Gateway, 35 F.3d at 1142* (noting "that it is within the district court's discretion to **[**28]**

increase or decrease the amount as necessary to comport with its findings, or to account for changed circumstances"); *Laboratory Corp. of America Holdings v. Kearns, 84 F. Supp. 3d 447, 2015 WL 413788, at *16 (M.D.N.C. 2015)* (explaining that "should either party conclude that a different figure would be proper, it may move for adjustment of the bond amount while the preliminary injunction is still in effect"). The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint. *In re President Casinos, Inc., 360 B.R. 262, 266 (B.A.P. 8th Cir. 2007)*; *APR Energy, LLC v. First Inv. Grp. Corp., No. 3:14-CV-575-J-34JBT, 88 F. Supp. 3d 1300, 2015 U.S. Dist. LEXIS 20524, 2015 WL 736275, at *17 (M.D. Fla. Feb. 20, 2015)*; *Philips Electronics N. Am. Corp. v. Hope, 631 F.Supp.2d 705, 724 n. 14 (M.D.N.C.2009)*; *Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006)*, *aff'd*, *246 Fed. App'x 73 (2d Cir. 2007)*. Here, defendants allege that the injunction seized its PayPal funds in the amount of $14,278 (Legend Trading) and $11,744.89 (mqxxc), and that the ten-thousand dollar $10,000 bond is insufficient to compensate all defendants where possibly millions of dollars have been frozen. But, in their request to increase the bond, defendants present nothing more than self-serving affidavits with no supporting evidence to justify such an increase. Given their better position to assess the damage that might result from having their PayPal accounts frozen, defendants should have provided **[**29]** affidavits or other evidence to establish the financial damage it would suffer from the injunction during the pendency of the case. *See Manpower Inc. v. Mason, 377 F. Supp. 2d 672, 681 (E.D. Wis. 2005)* (declining to require a $20 million bond where the restrained party provided no evidence to support that this amount was a reasonable expectation of the pecuniary harm it would suffer due to the injunction). It has not done so. As such, the court will not increase the bond amount. Defendants, however, may apply for a bond increase in the future if they can produce competent evidence of the pecuniary harm they may reasonably expect to suffer on account of this injunction.

## CONCLUSION AND ORDER

For these reasons, defendants' motions to dismiss and to release frozen funds (dkts. 50, 57) are denied.

Date: September 29, 2015

Page 13 of 13

136 F. Supp. 3d 897, *911; 2015 U.S. Dist. LEXIS 132283, **29

/s/ Joan Humphrey Lefkow

U.S. District Judge

A Neutral

As of: September 20, 2019 7:05 PM Z

# *Nordock, Inc. v. Systems, Inc.*

United States District Court for the Eastern District of Wisconsin

November 21, 2017, Decided; November 21, 2017, Filed

Case No. 11-CV-118

**Reporter**

2017 U.S. Dist. LEXIS 192413 *; 125 U.S.P.Q.2D (BNA) 1011 **; 2017 WL 5633114

NORDOCK, INC., Plaintiff, v. SYSTEMS, INC., Defendant.

**Subsequent History:** Motion denied by *Nordock, Inc. v. Sys., Inc., 2018 U.S. Dist. LEXIS 32405 (E.D. Wis., Feb. 28, 2018)*

**Prior History:** *Nordock, Inc. v. Sys., Inc., 681 Fed. Appx. 965, 2017 U.S. App. LEXIS 4732 (Fed. Cir., Mar. 17, 2017)*

## Core Terms

article of manufacture, patent, dock, lip, hinge plate, manufactured, infringing, profits, components, Amicus, factors, total profit, damages, parties, summary judgment, depicted, burden of production, smartphones, separately, Piano, bears, proposed findings of fact, patent holder, hinge, sales

**Counsel:** [*1] For Nordock Inc, Plaintiff: Jeffrey S Sokol, LEAD ATTORNEY, Sokol Law Office, Milwaukee, WI; Gregory W Lyons, O'Neil Cannon Hollman DeJong & Laing SC, Milwaukee, WI.

For Systems Inc, doing business as PoweRamp, doing business as DLM Inc, doing business as McGuire, Defendant: Philip P Mann, LEAD ATTORNEY, Mann Law Group, Seattle, WA; David A Affeldt, Affeldt Law Offices, West Allis, WI; John Whitaker, Whitaker Law Group, Seattle, WA.

**Judges:** WILLIAM E. DUFFIN, United States Magistrate Judge.

**Opinion by:** WILLIAM E. DUFFIN

## Opinion

[**1012] **DECISION AND ORDER**

### I. Facts and Procedural History

Nordock, Inc. holds a design patent regarding a "lip and hinge plate for a dock leveler." U.S. Patent No. D579,754 (the 'D754 Patent). When a semi-trailer is backed into a loading dock, a dock leveler bridges the gap between the floor of a loading dock and the bed of a semi-trailer. (ECF Nos. 258-1, ¶ 5; 221 at 17.) A dock leveler allows people and equipment such as forklifts to easily pass between the building and the trailer when loading or unloading cargo onto or from the trailer. (*Id.*)

The lip and hinge plate is the portion of the dock leveler that actually spans any gap between the building and the trailer and makes contact with the trailer [*2] bed. (*See* ECF Nos. 164 at 12, 13, 22-23, 64; 221 at 15.) When not in use, the lip normally hangs down perpendicular to the deck of the dock leveler; when in use, it comes up to be generally parallel with the deck. (ECF No. 164 at 23.)

Nordock filed this action alleging that Systems, Inc. was selling products that infringed the 'D754 Patent. On March 26, 2013, the jury returned a verdict in favor of Nordock. (ECF No. 172.) Concluding that Systems had no profit on the sales of its infringing dock levelers, the jury awarded Nordock $46,825 as a reasonable royalty. (ECF No. 172 at 3.)

Both sides appealed. The Court of Appeals for the Federal Circuit concluded that there was no evidence to support the jury's conclusion that Systems did not have any profit on the sales of its infringing dock levelers, *Nordock, Inc. v. Sys., Inc., 803 F.3d 1344, 1356 (Fed. Cir. 2015)*, and remanded the matter for a new trial on damages. *Id.* The Federal Circuit stated that at that new trial damages under *35 U.S.C. § 289* must be based on the profit from the sale of the entire dock leveler and not just the profit attributable to the lip and hinge plate.

Page 2 of 8

2017 U.S. Dist. LEXIS 192413, *2; 125 U.S.P.Q.2D (BNA) 1011, **1012

*Nordock, 803 F.3d at 1355*.

The United States Supreme Court granted Systems's request for review, summarily reversed, and remanded the case to the Federal Circuit in **[\*3]** light of its recent decision in *Samsung Elecs. Co. v. Apple Inc., 137 S. Ct. 429, 196 L.Ed.2d 363 (2016)*. *Sys., Inc. v. Nordock, Inc., 137 S. Ct. 589, 196 L.Ed.2d 471 (2016)*.

In *Samsung* Apple alleged that Samsung infringed its design patents for mobile phones. The design patents covered "a rectangular front face with rounded edges and a grid of colorful icons on a black screen." *Id. at 431*. A jury found that several Samsung smartphones infringed Apple's design patents and awarded Apple nearly $400 million in damages--the entire profit Samsung made from its sales of the infringing smartphones.

On appeal Samsung argued "that the profits awarded should have been limited to the infringing 'article of manufacture'" (for example, the case of the Samsung smartphone) and not the entire smartphone. *Apple Inc. v. Samsung Elecs.Co., 786 F.3d 983, 1002 (2015)*. The Federal Circuit rejected that argument, reasoning that limiting the damages award in this manner was not appropriate because the "innards of Samsung's smartphones were not sold separately from **[\*\*1013]** their shells as distinct articles of manufacture to ordinary purchasers." *Id.*

The Supreme Court disagreed with the Federal Circuit's conclusion that the article of manufacture must always be the product sold to consumers. It concluded that the term "article of manufacture" as used in *§ 289* "encompasses both a product sold to a consumer and a component of **[\*4]** that product." *Samsung, 137 S. Ct. at 434*. However, the Supreme Court did not articulate how a court is to identify the "article of manufacture."

Following the Supreme Court's decision remanding *Nordock to the Federal Circuit, Systems, 137 S. Ct. 589, 196 L. Ed. 2d 471*, the Federal Circuit in a brief per curiam opinion remanded the case to this court for a new trial on damages. *Nordock, Inc. v. Sys., Inc., 681 F. App'x 965 (Fed. Cir. 2017)*. The Federal Circuit stated, "The trial court will also have the opportunity to consider the parties' arguments with respect to the relevant 'article of manufacture' in the first instance." *Id. at 966*.

Following the death of the prior presiding judge, the case was randomly assigned to this court. All parties consented to this court's jurisdiction. Thus, it is now for this court to decide how the article of manufacture should be determined. The issue comes before the court on the parties' cross motions for partial summary judgment.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "Factual disputes are 'material' only when they 'might affect the outcome of the suit under the governing law'" and "'genuine' only 'if the evidence is such that a reasonable jury could **[\*5]** return a verdict for the [nonmovant].'" *Oest v. Ill. Dep't of Corr., 240 F.3d 605, 610 (7th Cir. 2001)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*. "The burden on the moving party may be discharged by demonstrating 'that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*. "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi., 829 F.3d 837, 841 (7th Cir. 2016)*.

In support of its motion for summary judgment Nordock submitted 75 proposed findings of fact (ECF No. 258-1) supported by voluminous documentation (ECF Nos. 258-3 - 261-15; 268-1 - 268-9; 266-1 - 266-3). Systems requested "that it be relieved from responding to each of Nordock's proposed statements of fact at this time and that, if the Court believes Nordock's statements are material or otherwise potentially dispositive, it be given a meaningful opportunity to depose these witnesses before responding specifically and individually to each of these statements under *Local Rule 56(b)(2)(B)*." (ECF No. 269 at 11.) Given the posture of this case and the context of the present dispute, where the foremost issue is determining the test that should apply for identifying the article of manufacture, the court **[\*6]** grants this unusual request. Many of Nordock's proposed findings of fact are not material. Others are not properly proposed findings of fact but rather represent legal conclusions. And others are not properly supported by appropriate citations. Of those material proposed findings of fact that are properly presented, the court does not find that any is reasonably subject to dispute. Therefore, as referenced below, the court will consider

Page 3 of 8

2017 U.S. Dist. LEXIS 192413, *6; 125 U.S.P.Q.2D (BNA) 1011, **1013

certain of the relevant proposed findings of fact for purposes of this motion.

## III. Analysis

### a. Burden

Systems argues that, in the absence of clarification from the Supreme Court or the Federal Circuit as to which party bears the burden of proof on what constitutes the article of manufacture, "the ordinary rule that a plaintiff bears the initial burden of proof on all issues, including the issue of damages, should not be disturbed." (ECF No. 262 at 9.) Nordock argues that it should be presumed that the article of manufacture is the product that is sold, and the burden should be placed on the alleged infringer to prove that the article of manufacture is something less than the entire product. (ECF No. 258 at 18.)

The parties refer to the "burden of proof," **[*7]** but that term can encompass both the burden of persuasion and the burden of production. *Cf. Director v. Greenwich Collieries, 512 U.S. 267, 272, [**1014] 114 S. Ct. 2251, 129 L. Ed. 2d 221 (1994).* For the sake of clarity, the court will refer to these concepts separately.

The plaintiff normally bears the burden of persuasion on all issues, including damages. *See Schaffer v. Weast, 546 U.S. 49, 56, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005); Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009); Smithkline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1164 (Fed. Cir. 1991).* The identification of the article of manufacture is part and parcel to damages under *§ 289.* Thus, the court concludes that the plaintiff bears the burden of persuasion with respect to identifying the article of manufacture and proving the defendant's total profit from that article of manufacture. *Apple, 2017 U.S. Dist. LEXIS 177199, at *90.*

However, once the plaintiff meets its initial burden of production with respect to the article of manufacture and the defendant's total profit on that article, if the defendant contends that the article of manufacture is something else, the defendant has the burden to produce evidence as to this alternative article of manufacture. The defendant also has the burden to produce evidence as to any deductions it believes are appropriate from the total profit identified by the plaintiff. *Apple, 2017 U.S. Dist. LEXIS 177199, at *96-97* (citing

*Henry Hanger & Display Fixture Corp. of Am. v. Sel-O-Rak Corp., 270 F.2d 635, 643 (5th Cir. 1959); Rocket Jewelry Box, Inc. v. Quality Int'l Packaging, Ltd., 250 F. Supp. 2d 333, 341 (S.D.N.Y. 2003)* vacated in part on other grounds, *90 F. App'x 543 (Fed. Cir. 2004)* (unpublished); *Bergstrom v. Sears, Roebuck & Co., 496 F. Supp. 476, 497 (D. Minn. 1980).*

Although *§ 289* does not explicitly impose any burden on the defendant, this shift in the burden **[*8]** of production is consistent with the disgorgement of profits in other contexts. *See SEC v. First City Fin. Corp., 281 U.S. App. D.C. 410, 890 F.2d 1215, 1232 (1989); SEC v. Teo, 746 F.3d 90, 112 (3d Cir. 2014)* ("When the SEC comes forward with a reasonable approximation of tainted profits, the burden of production then shifts to the defendant to produce evidence showing that all or some part of the sum in question should not be subject to disgorgement."). Similar burden shifting is countenanced with respect to lost profits under *§ 284. See Apple, 2017 U.S. Dist. LEXIS 177199, at *95* (discussing *Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1122 (Fed. Cir. 2003)).*

Moreover, this shift in the burden of production is appropriate because, as the United States noted when endorsing this approach as amicus curiae in *Samsung*:

> The defendant, as the manufacturer or seller of the accused product, has superior knowledge of the identity of the product's components, as well as of some of the factors relevant to the "article" determination, including the physical relationship between the design and the product; the manner in which the product is manufactured; and the extent to which the product reflects the innovations of parties other than the plaintiff. See *Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 494 n.17, 124 S. Ct. 983, 157 L. Ed. 2d 967 (2004)* (placement of burden of production may turn on which party has "peculiar means of knowledge" of the facts in question) (citation omitted); accord *Medtronic, Inc. v. Mirowski Family Ventures, LLC, 134 S. Ct. 843, 851, 187 L. Ed. 2d 703 (2014).*

*Samsung Electronics Co., Ltd. v. Apple Inc., Brief for the United States as Amicus Curiae Supporting Neither Party, 2016 WL 3194218, 30-31, 2016 U.S. S. Ct. Briefs LEXIS 2322, 50-51* (hereafter, Amicus).

In sum, **[*9]** the court finds that the approach taken by the district court on remand in *Samsung* is correct.

Page 4 of 8

2017 U.S. Dist. LEXIS 192413, *9; 125 U.S.P.Q.2D (BNA) 1011, **1014

The plaintiff bears the burden of persuasion in proving the relevant article of manufacture and in proving the amount of defendant's total profit under *§ 289*. The plaintiff also bears an initial burden of production on both of these issues. However, once the plaintiff satisfies its initial burden of production, the burden of production shifts to the defendant to come forward with evidence to support any alternative article of manufacture and to prove any deductible expenses.

*Apple, 2017 U.S. Dist. LEXIS 177199, at *98-99*.

### b. Method for Identifying the Article of Manufacture

In *Samsung* the United States as amicus curiae proposed a four factor test for purposes **[**1015]** of determining the article of manufacture: (1) the scope of the design claimed in the patent, including the drawing and written description; (2) the relative prominence of the design within the product as a whole; (3) whether the design is conceptually distinct from the product as a whole; and (4) the physical relationship between the patented design and the rest of the product. Amicus at 27-29; *2016 U.S. S. Ct. Briefs LEXIS 2322 at 46-48*. Systems argues that the court should apply this test. (ECF No. 262 at 6.)

Nordock contends that the "totality of the circumstances" test crafted by the United **[*10]** States is ineffective when applied to products that, unlike mobile phones, do not perform a broad range of functions. (ECF No. 258 at 21.) It argues that the analysis should begin with a presumption that the article of manufacture is the entire product sold by the infringer; a totality of the circumstances test should be applied only if certain threshold questions indicate that it is appropriate. (ECF No. 258 at 20-25.)

If a totality of the circumstances test is appropriate, Nordock proposes considering a far broader list of factors: whether the design patent identified the finished product to which it applied; whether the design element was sold as part of a larger, complete product; whether the design is seen together with other components when offered for sale; whether the infringer prominently displayed the design element in its sales materials; whether the portion to which the design element applied was necessary to perform the intended purpose of the overall product; whether the overall product performed a broad range of functions; whether the portion to which the design element applied was sold separately from the overall product; whether the design patent referred to other patents **[*11]** for the overall product; whether the design patent is a continuation of a utility patent claiming the entire overall product; whether a designer would need to consider the overall product to apply the design element; whether the infringer was aware of the design patent before it began selling the infringing product; whether it is possible to accurately identify the infringer's profits from the overall product; and whether it is possible to accurately identify the infringer's profits from the portion of the overall product to which the design element applied. (ECF No. 258 at 26-30.)

Nordock's position rests in part on a misreading of *§ 289*. *Section 289* states:

Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

*35 U.S.C. § 289*. Nordock contends that the phrase "for the purpose of **[*12]** sale" describes the "article of manufacture," suggesting that the article of manufacture is whatever is sold. (ECF No. 258 at 16.) Aside from the fact that this is essentially the conclusion rejected by the Supreme Court in *Samsung*, the phrase "for the purpose of sale" does not modify "article of manufacture" but rather modifies the entire phrase, "applies the patented design...to any article of manufacture[.]" Thus, it describes what a person must do to violate *§ 289*. A person who, without license, "applies the patented design ... to any article of manufacture" but does not do so "for the purpose of sale" does not violate *§ 289*.

Nor does *§ 289's* reference to the infringer's "total profit" suggest that the article of manufacture must be the entire product as sold to a consumer. (*Cf.* ECF No. 258 at 16.) The only reasonable reading of *§ 289* is that "total profit" refers to all of the profit from the sale of the article of manufacture, irrespective of whether the article of manufacture is the entire product or only a component of it. If only a component is the article of manufacture, profit from that component is not somehow less than the "total profit" referenced in the statute simply because it does not **[*13]** also include profit from other components.

Page 5 of 8

2017 U.S. Dist. LEXIS 192413, *13; 125 U.S.P.Q.2D (BNA) 1011, **1015

Identifying the article of manufacture as a component that is never sold separately from the entire product admittedly raises certain of the practical evidentiary problems that spurred Congress's reaction to *Dobson v. Hartford Carpet Co., 114 U.S. 439, 445, 5 S. Ct. 945, 29 L. Ed. 177, 1885 Dec. Comm'r Pat. 266 (1885)*, and led to the enactment of *§ 289*. But *Samsung* does not represent a resurrection of *Dobson* and a return to the apportionment scheme Congress rejected.

 [**1016] Courts have long recognized that patent holders may have a difficult time identifying the profits subject to disgorgement when the design is applied to an article of manufacture that is not independently offered for sale. *See Bush & Lane Piano Co. v. Becker Bros., 234 F. 79, 83 (2d Cir. 1916)* (discussing method for assessing profits related to a component); *see also id. at 85* (Ward, J., dissenting) (referring to method for determining profits "purely arbitrary" and concluding that, because plaintiff cannot prove the infringer's profits, plaintiff should receive only the $250 statutory award); *Young v. Grand Rapids Refrigerator Co., 268 F. 966, 974 (6th Cir. 1920)* (concluding that, despite an inability to prove profits associated with the handle to which the patented design element was applied, the patent holder was not entitled to recover all profits earned by defendant as a result of sales of refrigerators to which the infringing handles [*14] were attached).

But the court rejects the notion that difficulties a patent holder might have in identifying profits from something less than the entire product, by itself, supports the conclusion that the entire product is the article of manufacture. It is true that some of the factors that are relevant in determining what is the article of manufacture might be the same as those that lead to difficulties in identifying the profits from a component. But if the obstacle is so great as to generally deny patent holders the relief that Congress intended in enacting *§ 289*, it is up to Congress to amend the law, just as it did in response to *Dobson*. Or Congress could conclude the scheme is unworkable and eliminate disgorgement of an infringer's profits as a remedy, as it did in 1946 with respect to utility patents, *see* 1-23 Chisum on Patents §§ 20.02[4], 23.05[1][d][vi] (2017). But these issues have been noted by courts for decades and Congress has not yet intervened.

Importantly, the holder of a design patent is not limited to *§ 289* for relief. Thus, evidentiary hurdles in proving profit from a component do not foreclose relief. A patent holder may alternatively seek relief under *§ 284*—for example, in the form of its lost profits or a reasonable [*15] royalty. *See, e.g., Catalina Lighting v. Lamps Plus, 295 F.3d 1277, 1290 (Fed. Cir. 2002)*; *Braun Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 824 n.16 (Fed. Cir. 1992)*; *Sel-O-Rak Corp. v. Henry Hanger & Display Fixture Corp., 159 F. Supp. 769, 776 (S.D. Fla. 1958)*. Damages under *§ 284* (but not *§ 289*) may then be tripled by the court. *Braun Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 824 (Fed. Cir. 1992)*.

The court finds that the four-factor test proposed by the United States as amicus in *Samsung* is appropriate, consistent with the relevant statutory law, and supported by the case law. The factors identified by Nordock are often inconsistent with *Samsung* or are not helpful in identifying the article of manufacture. Nordock is largely arguing that the Supreme Court's holding in *Samsung* is limited to products that perform a broad range of functions. Although smartphones were at issue in *Samsung*, and the Supreme Court acknowledged the broad range of functions they perform, nothing in the Court's decision suggests that its holding was limited to such multi-functional products. This error affected many of the arguments Nordock offered as to the propriety of its proposed factors.

However, although the court rejects the factors proposed by Nordock, the court does not believe that the four factors proposed by the United States and by Systems will always be the *only* factors relevant to determining the article of manufacture. As the Court of the Appeals for the Second Circuit recognized when confronting this [*16] issue over 100 years ago, each case presents its own problems and it might not be possible to articulate factors that will apply in every instance. *Bush & Lane Piano Co., 234 F. at 81*. Rather, each design patent must be considered in context and "considered from all viewpoints, technical, mechanical, popular, and commercial." *Id.*

In identifying an "article of manufacture," it would seem obvious that a significant factor would be *how* the product is manufactured. The United States repeatedly noted the significance of this factor and perhaps intended it to be encompassed within its fourth factor regarding the physical relationship between the portion of the product to which the design applies and the whole product. *See* Amicus at 29, *2016 U.S. S. Ct. Briefs LEXIS 2322 at 48* (discussing the fourth factor and stating that a relevant consideration is whether "the design is embodied in a component that is manufactured separately from the rest of the product"). In its "summary of argument" the United States explicitly stated that one of the considerations relevant to

Page 6 of 8

2017 U.S. Dist. LEXIS 192413, *16; 125 U.S.P.Q.2D (BNA) 1011, **1016

determining the article **[\*\*1017]** of manufacture is "the manner in which the components were manufactured." Amicus at 9, *2016 U.S. S. Ct. Briefs LEXIS 2322 at 18*; *see also* Amicus at 31, *2016 U.S. S. Ct. Briefs LEXIS 2322 at 51* (noting that defendant should have the burden of producing evidence as to the relevant article of manufacture **[\*17]** in part because it has superior knowledge of "the manner in which the product is manufactured"); Amicus at 32-33, *2016 U.S. S. Ct. Briefs LEXIS 2322 at 53* (arguing remand is appropriate in part because petitioner had not "identified record evidence or argument concerning other factors, such as ... the manner in which the components were manufactured").

A finished product might appear to be a unitary structure, but if considered in light of how it was manufactured it might be recognizable as a collection of components. Or vice versa. Facts relating to the manufacturing process might be otherwise relevant in a myriad of ways to identifying the article of manufacture. Therefore, the court concludes that how a product is manufactured merits explicit consideration as a factor when attempting to determine what is the relevant article of manufacture.

### c. Identifying the Article of Manufacture

Identifying the article of manufacture is generally for the jury. *See* Amicus at 9, 16, 25-28, *2016 U.S. S. Ct. Briefs LEXIS 2322 at 18, 28-29, 43-44, 46-48*. But, as with other jury questions, summary judgment may be appropriate if there is no genuine dispute of material fact or if there is only one conclusion that a reasonable jury could reach. Upon reviewing the record as a whole, paying particular attention to the parties' present submissions, the court concludes it is unable to **[\*18]** identify the article of manufacture. The question must be decided by the finder of fact.

The 'D754 Patent claims "[t]he ornamental design of a lip and hinge plate for a dock leveler ...." Other dock levelers may have a lip and hinge plate but use a simple tubular or piano hinge. (ECF Nos. 164 at 91; 230 at 25.) The 'D754 Patent claims a lip and hinge plate that uses what is often referred to as a lug hinge (*see* ECF Nos. 164 at 31; 222 at 11). According to Nordock's CEO, combining the open lug hinge with the header plate made Nordock's design unique. (ECF No. 230 at 60.) As depicted in Figure 1 of the 'D754 Patent, shown below, each lug hinge is comprised of a pair of elements, one attached to the lip and one attached to the hinge plate.

A rod runs through the elements, allowing rotation along an axis. (*See also* ECF No. 258-5 at 23, 8:14-52 (description of dock leveler contained in U.S. Patent No. 6,834,409.)



FIG. 1

The 'D754 Patent clearly states that the claimed lip and hinge plate is "for a dock leveler." The patent partially depicts the dock leveler. There is no evidence that Systems ever sold an infringing dock leveler without a lip and hinge plate. (*See* ECF No. 258-1, ¶¶ 49-50.) Conversely, "there [is] no evidence **[\*19]** that Systems sold a 'lip and hinge plate' separate from the leveler as a complete unit." *Nordock, 803 F.3d at 1355*. A dock leveler is generally unable to perform its intended function without a lip. (ECF No. 258-1, ¶¶ 17, 51; ECF No. 164 at 64.) And because it is welded to the dock leveler, repair or replacement of only the lip and hinge plate would be difficult or impractical. (ECF No. 258-1, ¶ 52.)

Nonetheless, in light of the Supreme Court's conclusions in *Samsung*, even accepting these facts as true does not *necessarily* mean that the entire dock leveler is the article of manufacture. Much more important in light of *Samsung* is the fact that the patented design element relates to only a portion of the overall product. Depicted here is a complete dock leveler. The lip and hinge plate constitutes only the uppermost segment.

 **[\*\*1018]**

Page 7 of 8

2017 U.S. Dist. LEXIS 192413, *19; 125 U.S.P.Q.2D (BNA) 1011, **1018



(ECF No. 264, ¶ 8 (depicting Systems's infringing dock leveler).)

Although not readily physically severable because the components are welded together, *Nordock, 803 F.3d at 1355*, there is evidence in the record that the lip and hinge plate is conceptually distinct from the overall dock leveler. For example, Nordock's CEO testified that there are three main components to a dock leveler — the lower portion, called the **[*20]** frame; the "deck or the platform"; and the "front top section" or "the lip assembly." (ECF No. 230 at 15 (trial testimony of Nordock CEO); *see also* ECF No. 230 at 34 (same).) All components of the dock leveler must function together for it to perform its intended purpose. (*See* ECF No. 164 at 64 (testimony of Nordock CEO stating that a dock leveler would not work if any component were removed).) But that does not mean that it is not a system of conceptually distinct components in much the same way the components of an automobile are distinct but must work together to achieve the object's intended function.

The design element is relevant only to the lip and hinge plate; it has no relevance to any other component of the dock leveler. Nordock may have intended its hinge design to give the overall dock leveler a distinct look. (*See* ECF Nos. 164 at 65, 74; 230 at 15-16, 59-60.) But that does not make the entire dock leveler the article of manufacture, just as the distinct design of a piano case did not make the entire piano the article of manufacture, *Bush & Lane Piano Co. v. Becker Bros, 222 F. 902, 904 (2d Cir. 1915)*.

The distinction between the lip and hinge plate and the rest of the dock leveler is evident in that the design patent depicted only the lip **[*21]** and hinge plate (it depicted a fragment of the dock leveler in the form of broken lines only to show context of the lip and hinge plate, *see* U.S. Patent and Trademark Office, Manual of Patent Examining Procedure, § 1503.02). The patent expressly states that the portions depicted by broken lines "represent environmental structure in order to show the claim in a condition of use and form no part of the claimed design." 'D754 Patent.

As to how the object is manufactured, the court has not located in the record evidence as to Systems's manufacturing methods. There is, however, evidence that *Nordock* welds and paints each component separately before it assembles the complete dock leveler. (ECF No. 230 at 15; *see also* ECF No. 230 at 77-78 (description of Nordock's manufacturing process).) And there is some reason to suspect that a Systems dock leveler is manufactured in a similar manner. (*Cf.* ECF No. 230 at 79 (Nordock CEO's testimony that the two prior deck leveler manufacturers he worked for used a similar manufacturing process).) But the court finds it inappropriate at this stage to rely upon an assumption that Systems's manufacturing methods are the same as Nordock's.

Without knowing what the evidence **[*22]** might be, it is difficult to speculate how this factor might impact identifying what the article of manufacture is. Obviously, if the lip and hinge plate is manufactured as a single unit wholly distinct from any other portion of the dock leveler, such evidence would tend to support a conclusion that the lip and hinge plate is the article of manufacture. On the other hand, if Systems manufactures the lip and hinge plate in a process where there is no ready distinction from the other aspects of the dock leveler, that would tend to support a finding that the entire dock leveler is the article of manufacture. Or a consideration of Systems's manufacturing processes might support a finding that neither Nordock nor Systems is correct and that something other than the entire dock leveler or merely the lip and hinge plate is the article of manufacture.

In light of this evidentiary gap, as well as the general notion that determining the article of manufacture is a question for the jury rather than the court, the court must deny both of the pending motions for summary judgment.

**IT IS THEREFORE ORDERED** that the motion of Nordock, Inc., as to the article of manufacture (ECF No. 257), is **denied**.

**IT [*23] IS FURTHER ORDERED** that the motion of Systems, Inc. as to the article of manufacture (ECF No. 263), is **denied**.

**IT IS FURTHER ORDERED** that the Clerk shall set this matter for a telephonic scheduling **[**1019]** conference to discuss further scheduling in this matter.

Page 8 of 8

2017 U.S. Dist. LEXIS 192413, *23; 125 U.S.P.Q.2D (BNA) 1011, **1019

Dated at Milwaukee, Wisconsin this 21st day of November, 2017.

/s/ William E. Duffin

WILLIAM E. DUFFIN

U.S. Magistrate Judge

**End of Document**

# *Chloe v. Queen Bee of Beverly Hills*

United States District Court for the Southern District of New York

July 16, 2009, Decided; July 21, 2009, Filed

06 Civ. 3140 (RJH) (MHD)

**Reporter**

2009 U.S. Dist. LEXIS 84133 *

CHLOÉ, a division of RICHEMONT NORTH AMERICA, INC. and CHLOÉ, S.A., Plaintiffs, -against- QUEEN BEE OF BEVERLY HILLS, et al., Defendants.

**Subsequent History:** Adopted by *Chloe v. Zarafshan, 2009 U.S. Dist. LEXIS 84255 (S.D.N.Y., Sept. 14, 2009)*

**Prior History:** *Chloe v. Queen Bee of Beverly Hills, LLC, 630 F. Supp. 2d 350, 2009 U.S. Dist. LEXIS 55860 (S.D.N.Y., 2009)*

## Core Terms

profits, infringement, default, counterfeit, damages, documents, products, trademark, willful, trebling, deposition, set-off, costs, attorney's fees, customer, handbags, records, cases, disgorgement, defendants', subpoena

**Counsel:** **[1]** For Chloe, a division of Richemont North America, Inc., Chloe, S.A., Plaintiffs: Milton Springut, Tal S. Benschar, LEAD ATTORNEYS, Kalow & Springut, L.L.P., New York, NY.

For Queen Bee of Beverly Hills, LLC, Rebecca Rushing, also known as Rebecca Grelier, Defendants: Peter A. Mahler, LEAD ATTORNEY, Farrell Fritz, P.C. (NYC), New York, NY; Aaron Eliezer Zerykier, Ganfer & Shore, LLP, New York, NY.

Sun-Eye Productions, Inc., Defendant, Pro se; Peter A. Mahler, LEAD ATTORNEY, Farrell Fritz, P.C. (NYC), New York, NY; Aaron Eliezer Zerykier, Ganfer & Shore, LLP, New York, NY.

Jennifer Suns, Defendant, Pro se; Peter A. Mahler, LEAD ATTORNEY, Farrell Fritz, P.C. (NYC), New York, NY; Aaron Eliezer Zerykier, Ganfer & Shore, LLP, New York, NY.

For Simone Ubaldelli, Defendant: Michael Frederic Konopka, LEAD ATTORNEY, New York, NY.

**Judges:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE. HONORABLE RICHARD J. HOLWELL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MICHAEL H. DOLINGER

## Opinion

**REPORT & RECOMMENDATION**

**TO THE HONORABLE RICHARD J. HOLWELL, U.S.D.J.**:

Plaintiffs commenced this lawsuit against a number of defendants, asserting that defendants had infringed plaintiffs' registered trademarks, in violation of the Lanham Act, *15 U.S.C. § 1114(1)*. **[2]** Among the relief that plaintiffs requested was an award of damages under *15 U.S.C. § 1117*, against Mohammed Alexander Zarafshan, a/k/a Alexander Zar (hereinafter "Zar").

On December 18, 2006, the District Court entered a default judgment against Zar, including a finding of liability and a permanent injunction. (See Order dated Dec. 13, 2006). It then referred the case to us for an inquest for damages. (Order dated Oct. 31, 2008). Following this reference, we directed plaintiffs to serve and file papers on the issue of damages by December 12, 2008 and invited Zar to respond by January 12, 2009. (See Order dated Nov. 21, 2008). Although Chloé timely complied, Zar did not submit any response papers.

We have since directed plaintiffs to submit two supplemental memoranda of law on issues related to the inquest. In the first memorandum, plaintiffs were ordered to address the effect of any settlement with other defendants on the award against Zar. (See Order dated June 19, 2009). Plaintiffs timely responded. (See

Pls.' Mem. dated June 23, 2009). In the second memorandum, plaintiffs were to address the legal basis for their assessment that the entire $2.4 million in revenues received by defendant **[*3]** be allocated to the infringing products. (See Order dated July 1, 2009). Again, plaintiffs timely responded. (See Pls.' Mem. dated July 9, 2009).

We conclude that the determination of damages against Zar would not be premature and recommend that plaintiffs should be awarded disgorgement of Zar's profits, and the trebling of that amount, yielding a judgment for $7.2 million.

## THE PERTINENT FACTS

### 1. The Status of Mohammed Alexander Zarafshan

In light of Zar's default, we must accept as true the well-pled allegations of the complaint that are pertinent to liability. See *Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004)*; see also *Chen v. Jenna Lane, Inc., 30 F. Supp.2d 622, 623 (S.D.N.Y. 1998)*; see generally *Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)*. We therefore rely on the factual allegations of the complaint as well as the additional declarations filed by plaintiffs containing pertinent factual allegations. See, e.g., *Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993)*; *Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d Cir. 1991)* (quoting *Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989))*.

Chloé designs, **[*4]** produces, markets and sells high quality goods, including women's clothing and accessories, under its famous "Chloé" trademark in the United States and in many foreign countries. It is the owner of numerous trademark registrations for its "Chloé" trademark, among them, federal trademark registrations in the United States for clothing, clothing accessories, fabrics and other items, including Registration No. 1,491,810 for handbags, purses and other items. (Am. Compl. P 12). [1] Zar had been the supplier of the defendants in this action who have offered for sale, sold, advertised and distributed handbag items bearing copies of the Chloé trademark that are not genuine and are counterfeit. (Id. PP 9, 17). Defendants' use of the "Chloé" trademark was without plaintiffs' consent and caused injury to its business

---

[1] A copy of that registration is attached as Exhibit A to the Complaint.

reputation by causing the purchasing public to believe that the defendants' counterfeit goods conformed to Chloé's standards. (Id. PP 19, 29).

In 2006, plaintiffs were alerted to the sales of counterfeit handbags by an internet merchant named Queen Bee of Beverly Hills, LLC ("Queen Bee") with locations in Los Angeles, **[*5]** California and Huntsville, Alabama. (Pl.'s Mem. dated Dec. 12, 2008). Chloé brought suit against Queen Bee and its two principals, Rebecca Rushing and Simone Ubaldelli, as well as against Jennifer Suns, an officer and managing agent of defendant Sun-Eye Productions, Inc. ("Sun-Eye"). (Compl. PP 4-8). Following commencement of the litigation, the Court issued an ex parte order authorizing the seizure of documents and counterfeit goods located at defendants' offices in Huntsville and Beverly Hills. (See Order dated Apr. 25, 2006).

Upon reviewing the seized documents and taking depositions, plaintiffs ascertained that Mr. Zar had been defendants' supplier of counterfeit Chloé products. (Am. Compl. P 9). During the deposition of defendant Ubaldelli, it was revealed that an individual named "Guido" was Queen Bee's sole supplier of handbags, including those handbags that had been seized from Queen Bee and later determined to be counterfeit. (See Milton Springut, Esq. Decl., executed on Dec. 12, 2008 ("Springhut Decl. 1") Ex. A at 31-32). Ubaldelli subsequently identified "Guido" as Mr. Alexander Zar. (Id. Ex. A at 101). Zar's identity was confirmed by email correspondence seized from defendants. **[*6]** (Id. Ex. B).

Ubaldelli stated that he had paid for merchandise from Guido by check, made out to one of two companies, BCBL and A&A Trading, and that Guido had confirmed that he was receiving the funds, stating, "That's my company." (Id. Ex. A at 42). At his own deposition, Zar admitted that he had authority to sign checks on behalf of BCBL on its Wells Fargo bank account. (Id. Ex. C at 81). Furthermore, the A&A Trading bank account lists Mr. Zar's home address in Los Angeles on the opening document. (Id. Ex. D at 108). In the documents subpoenaed from Wells Fargo Bank with respect to A&A Trading and BCBL, the Queen Bee checks often include the word "Guido" on the memo endorsement and in some cases the word "Alex." (See, e.g., id. Exs. F & G).

Following these disclosures, the Court authorized the plaintiff to amend the complaint to add Zar as a defendant. (See Order dated Nov. 1, 2006). Having been served, Zar failed to appear and a default

judgment was entered. (See Order dated Dec. 13, 2006). The Order for Default required Zar to produce all documents concerning damages, but he did not produce any documents. (Id.). In addition, prior to their deposition of Zar, plaintiffs served a **[*7]** subpoena upon him, calling for an extensive production of documents. Zar failed to produce any documents in response. (See Milton Springut, Esq. Decl., executed on July 8, 2009 ("Springhut Decl. 2") Ex. A).

Plaintiffs now seek an award of disgorged profits from Zar in the amount of $2.4 million and ask the Court to assess treble profits of $7.2 million, based on Zar's willful conduct. To prepare for the inquest, plaintiffs subpoenaed bank records from Wells Fargo Bank with respect to the two companies that Zar had used to receive payment for the goods. These records reflected a total of $2,467,071.09 in receipts from various customers, including defendant Queen Bee. (See Springut Decl. 1 P 4 & Exs. H & I). At his deposition, Zar was shown numerous copies of checks obtained from Wells Fargo, which were grouped by customer. (See Springut Decl. 2 Ex. B at 85-108). Although he was shown each customer group individually, he claimed not to be able to identify the product reflected in such payments, and in many cases he claimed that he could not even identify the customer. Plaintiffs invited Zar to characterize these transactions, but he denied any knowledge or possession of any documents **[*8]** that would shed light on the issue. (See Springut Decl. 2 Ex. B at 105). Plaintiffs ask the Court to assess treble profits of $7.2 million in light of defendant's "willful and knowing counterfeiting." (Pls.' Mem. at 9).

## 2. The Status of the Other Defendants

Since the inception of the lawsuit on April 24, 2006, there have been notable developments with respect to the other defendants in the suit. On July 10, 2007, defendants Queen Bee and Rebecca Rushing filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Alabama. (See Bankr. Pets. entered July 12, 2007). In light of their pending bankruptcy petitions, the case has been stayed as to these defendants. Plaintiffs settled with defendant Jennifer Suns and her company, Sun-Eye, with entry of a consent judgment in the total amount of $15,000.00. (See Consent J. dated Dec. 29, 2007). Defendant Ubaldelli's motion to dismiss for lack of personal jurisdiction was granted, thereby terminating him from the case. (See Order dated Aug. 1, 2008). By letter dated February 19, 2009, plaintiffs moved to certify Ubaldelli's dismissal from the case as final under *Fed. R. Civ. P. 54(b)*, **[*9]** and the Court then directed the entry of final judgment as to Ubaldelli, finding no just reason for delay. (See Mem. Opinion and Order dated June 29, 2009).

## ANALYSIS

### 1. Prematurity

Because plaintiffs seek an award against only one of multiple defendants, we must first consider whether that assessment is premature. An award of profits under the Lanham Act is ordinarily made jointly and severally against all defendants who participated in or contributed to the infringement. See *Gillette Co. v. Wilkinson Sword. Inc., 795 F.Supp. 662, 664-65 (S.D.N.Y. 1992)*. As noted, defendant Ubaldelli has been terminated from the case pursuant to a motion to dismiss for lack of personal jurisdiction. (See Order dated Aug. 1, 2008). Defendants Queen Bee and Rebecca Rushing have filed for bankruptcy and have had this action stayed as against them. (See Bankr. Pets. entered July 12, 2007). Defendant Jennifer Suns and her company, Sun-Eye, have agreed to pay a total of $15,000.00 in lieu of any and all claims against them. (See Consent J. dated Dec. 29, 2007). We conclude that under these circumstances, a default judgment specifying an amount of damages against Zar would not be premature.

The principles **[*10]** governing the default of some but not all defendants in a litigation derive from the 1872 decision of the Supreme Court involving an allegation of fraud against fourteen defendants, one of whom failed to plead. *Frow v. De La Vega, 82 U.S. 552, 554, 21 L. Ed. 60 (1872)*. The Court observed that entering a final judgment against one defendant on the merits, while the case was proceeding against the others, could result in an anomaly if there were "one decree of the court sustaining the charge of joint fraud committed by the defendants; and another decree disaffirming the said charge, and declaring it to be entirely unfounded, and dismissing the complainant's bill." *Id. at 554*.

Courts have subsequently construed Frow narrowly, holding that if the liability sought to be imposed is joint and several rather than joint, the rationale of Frow does not apply, since it would not be inconsistent to hold some but not all of the defendants liable. See, e.g., *Farberware v. Groben, 1991 U.S. Dist. LEXIS 8994, 1991 WL 123964, at *3 (S.D.N.Y. July 3, 1991)*. Nonetheless, even if liability is joint and several and thus a default may be entered, it may be appropriate in a multi-defendant case to enter judgment solely as to

liability against the [*11] defaulting defendant, and to await the adjudication of the liability of co-defendants before assessing the amount of damages against all defendants. This approach is justified to avoid inconsistent damage determinations. See *Farzetta v. Turner & Newall, Ltd., 797 F.2d 151, 154 (3d Cir. 1986)*; *Martin v. Coughlin, 895 F.Supp. 39, 43 (N.D.N.Y. 1995)*; *Exquisite Form Indust., Inc. v. Exquisite Fabrics of London. 378 F.Supp. 403, 416 (S.D.N.Y. 1974)*.

In this case, however, the problem of inconsistent damage awards does not arise. As noted, the case has been stayed with respect to defendants Queen Bee and Rebecca Rushing, due to their pending bankruptcy petitions. See *11 U.S.C. § 362(a)(1)*. The stay is, of course, applicable only to proceedings against the debtor and not to other co-defendants, see, e.g., *Teachers Ins. & Annuity Ass'n of Am. v. Butler, 803 F.2d 61, 64-65 (2d Cir. 1986)*, and there is no reason to withhold judgment against Zar while waiting for the bankruptcy proceeding to be resolved. [2] Defendant Ubaldelli has been terminated from the case. Finally, defendants Suns and Sun-Eye have been dismissed pursuant to a settlement. [3]

In sum, there is no compelling reason to withhold a determination of damages to be awarded against Zar at this stage of the proceeding.

2. Legal Criteria

Plaintiffs seek disgorgement of Zar's profits and a trebling of those profits. The Lanham Act authorizes several forms of recovery for trademark infringement. Of particular relevance here, the plaintiff may "recover (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action", and in exceptional cases the plaintiff may also recover reasonable attorney's fees. See *15 U.S.C. § 1117(a)*. In cases involving the use of a counterfeit trademark, damages may be trebled. See *15 U.S.C. § 1117(b)*.

An award of an infringer's profits under the Lanham Act serves to compensate the plaintiff for the injuries it suffered as a result of the defendant's infringement. See *15 U.S.C. § 1117(a)* (stating that an award under the statute "shall constitute compensation and not a

penalty"); *Lyons P'Ship, L.P. v. AAA Entm't Inc., 1999 U.S. Dist. LEXIS 18996, 1999 WL 1095608, *10 (S.D.N.Y. Dec. 3, 1999)*; see also *Nintendo of Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1011 (9th Cir. 1994)* [*13] (observing that actual damages under the Lanham Act serve to compensate plaintiffs and prevent defendants' unjust enrichment). To recover an infringer's profits plaintiffs must show that an infringer acted with willful deception, in addition to showing (1) the defendant's unjust enrichment; (2) the plaintiff's damages, if any, from the infringement; or (3) that an accounting for profits is necessary to deter future willful infringement. *George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992)*; see also *Gidatex, S.r.L. v. Campaniello Imps., Ltd., 82 F.Supp.2d 136, 141 (S.D.N.Y. 2000)*. Since, however, the availability of such an award is "subject to the principles of equity," *Gidatex, 82 F.Supp.2d at 141*, a prevailing plaintiff is not automatically entitled to an accounting for the defendant's profits. See, e.g., *W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 664 (2d Cir. 1970)*. Relief is available, rather, on a discretionary basis against an infringer who has been shown to have acted in bad faith. See, e.g., *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger. U.S.A., Inc., 80 F.3d 749, 753 (2d Cir. 1996)*.

Once plaintiffs have justified an award of the defendant's [*14] profits, they must prove only the defendant's sales; the defendant has the burden to prove any costs or deductions from its gross revenues. See *15 U.S.C. § 1117(a)*. This principle dates back to a decision by the Supreme Court holding that the burden would be on defendant to establish any proper cost to deduct from the entire stream as well as to identify any element of profit that was intrinsic to the product itself and not to the use of the trade name. *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 262, 36 S. Ct. 269, 60 L. Ed. 629, 1916 Dec. Comm'r Pat. 281 51 (1916)*; see also *Basch, 968 F.2d at 1539*; *Gidatex, 82 F.Supp.2d at 141-42*. Moreover, if "the actual sales cannot be precisely determined, the court may resolve any doubts against the defendant in calculating profits, particularly if the uncertainty is due to the defendant's inadequate record-keeping or failure to produce documentary evidence." *Aris Isotoner Inc. v. Dong Jin Trading Co., 1989 U.S. Dist. LEXIS 18446, 1989 WL 236526, *17 (S.D.N.Y. Sept. 14, 1989)*. See also *Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 972 (2d Cir. 1985)*. It bears noting, however, that some reasonable basis for computation has to be used, even though the calculation may only be approximate. See *GTFM. Inc. v. Solid Clothing, Inc., 215 F.Supp.2d 273,*

---

[2] There is no indication in the record that plaintiffs [*12] here have applied to lift the bankruptcy stay.

[3] We address below the impact, if any, of the settlement against Zar. (See infra pp. 17-18).

*305 (S.D.N.Y. 2002)*.

### 3. [*15] Recommended Profits Award

Zar's default amounts to a concession of liability, that is, he knowingly supplied counterfeit goods to his co-defendants. His default in this case underscores his bad faith and reinforces our conclusion that disgorgement of his profits is warranted. See, e.g., *Tiffany (NJ) Inc. v. Luban, 282 F.Supp.2d 123, 124 (S.D.N.Y. 2003)*. We therefore turn to a calculation of those profits.

Plaintiffs seek an award of profits in the amount of $2.4 million. Of necessity, plaintiffs base their profits calculation on bank records subpoenaed from Wells Fargo Bank with respect to the two companies that Zar used to receive payment for the counterfeit goods. These records show a total of $2,467,071.09 in receipts from various customers, including Queen Bee. (See Springut Decl. 1, Exs. H-I).

Plaintiffs concede that these records offer no guidance as to how much of this revenue stream related to Chloé products (as opposed to other products not at issue in this case) or as to the costs incurred in acquiring and selling these products. (Pls.' Mem. at 8). It also does not reflect what portion of Zar's profits for the sale of counterfeit Chloé products is attributable to the trademark, [*16] as distinguished from the product itself. These gaps, however, do not affect the ultimate result.

On the last point, the Supreme Court held, prior to enactment of the Lanham Act, that where an apportionment between profits attributable to the infringement and those attributable to the intrinsic merit of the product itself is inherently impossible, "it is more consonant with reason and justice that the owner of the trade-mark should have the whole profit than that he should be deprived of any part of it by the fraudulent act of the defendant." *Hamilton-Brown, 240 U.S. at 262*; *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 206-07, 62 S. Ct. 1022, 86 L. Ed. 1381, 1942 Dec. Comm'r Pat. 767 (1942)*. Although there is a paucity of Second Circuit case law addressing this issue, other courts have placed the burden of apportioning total revenue for this purpose on the defendant. See, e.g., *WMS Gaming, Inc. v. WPC Prods. Ltd., 542 F.3d 601, 607-09 (7th Cir. 2008)*; *Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 64 (1st Cir. 2008)* (defaulting defendant bore burden of showing which portion of its revenue stream was attributable to infringement and which was not).

As for the allocation of Zar's revenues between costs of products [*17] and profits, the statute expressly provides that "defendant must prove all elements of cost or deduction claimed." *15 U.S.C. § 1117(a)*. Since defendant chose to default and has not appeared in this proceeding, he has necessarily failed to carry his burden to demonstrate deductible expenses.

Finally, although it is reasonable to infer that some part of the more than $2.4 million in revenues to Zar is attributable to sales of non-Chloé products, Zar has prevented plaintiffs from ascertaining any facts relevant to the allocation. The default judgment required Zar to produce all documents concerning damages in the action (see Order dated Dec. 13, 2006), but he failed to produce any documents whatsoever. Moreover, Zar failed to produce any documents in response to plaintiffs' subpoena, compelling plaintiffs to subpoena account records from his bank. (See Springut Decl. 2 Ex. A). Furthermore, at his deposition, Zar was shown numerous copies of checks obtained from Wells Fargo Bank, grouped by customer, but he claimed not to be able to identify the products for which he received those payments and, in many cases, not even the customer. Plaintiffs invited Zar to characterize these transactions, [*18] but he denied any knowledge or possession of any documents that would shed light on the issue. (See Springut Decl. 2 Ex. B at 105). In view of Zar's refusal to produce discovery and his plainly dishonest performance at his deposition, as well as his subsequent failure to participate in this proceeding, the amount of deposits targeted by plaintiffs -- $2,400,000.00 - should be awarded as disgorged profits from the sale of counterfeit Chloé products.

### 4. Trebling of Profits

Plaintiffs seek an enhanced award that reflects willfulness on the part of Zar. For purposes of trebling the award, an infringement is "willful" if the defendant had "knowledge that its actions constitute an infringement." *Fitzgerald Publ'g Co. v. Baylor Publ'g Co., 807 F.2d 1110, 1115 (2d Cir. 1986)*. This knowledge may be "actual or constructive." Id. Willfulness may be established by a party's default because an innocent party would presumably have made an effort to defend itself. See, e.g., *Tiffany, 282 F.Supp.2d at 124*; *Fallaci v. New Gazette Literary Corp., 568 F.Supp. 1172, 1173 (S.D.N.Y. 1983)*.

Plaintiffs ask the court to assess treble profits of $7,200,000.00. The trebling of defendant's profits is mandatory [*19] if the court finds that defendants'

actions were willful, absent extenuating circumstances. *15 U.S.C. § 1117(b)*; *Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 971-72 (2d Cir. 1985)*.

We conclude that Zar is a willful counterfeiter and that the trebling of his profits is appropriate.

5. Set-Off

Since the case has been settled as to defendants Sun-Eye and Suns for a total of $15,000.00, a set-off of the compensatory damage award would normally be appropriate. The Second Circuit has recognized that federal common law governs whether a defendant in an action brought under federal law is "entitled to a credit against judgment for the settlement by another party to the dispute." *Singer v. Olympia Brewing Co., 878 F.2d 596, 599 (2d Cir. 1989)* (holding that whether to credit a defendant with a set-off affects substantive, not procedural, rights). The United States Supreme Court has held that the amount of any set-off of a damage award should be determined by the jury's allocation of proportionate responsibility to the released defendant. See *McDermott, Inc. v. Amclyde, 511 U.S. 202, 213-14, 114 S. Ct. 1461, 128 L. Ed. 2d 148 (1994)*; see also *Bragger v. Trinity Capital Enter. Corp., 30 F.3d 14, 17 (2d Cir. 1994)* (applying **[*20]** McDermott set-off rule to a securities class action); *Gravatt v. City of New York, 73 F.Supp.2d 438 (S.D.N.Y. 1999)* (recognizing McDermott governs federal actions brought in New York).

If, however, a party defaults in answering the complaint, courts have held that it may not invoke the benefits of the set-off rule. See *RLI Ins. Co. v. King Sha Group. Inc., 598 F.Supp.2d 438, 447 (S.D.N.Y. 2009)*. Zar has twice defaulted: first in failing to answer the complaint, and second in failing to respond to the damages inquest. Hence he has made no attempt to prove that he is entitled to the benefits of the set-off rule. See *id. at 447* ("The non-settling defendant bears the burden, however, of establishing the extent to which a recovery against it would be duplicative of the plaintiff's recovery from settling defendants"). Zar has therefore not carried his burden and is ineligible to benefit from the set-off rule.

6. Attorneys' Fees

Plaintiffs are also entitled to an award of reasonable attorney's fees and costs, although they have not sought a specific amount. The Lanham Act authorizes the award of costs in all cases and an award of reasonable attorney's fees in exceptional cases. See *15 U.S.C. § 1117(a)*. **[*21]** Deliberate and willful infringement can render a case "exceptional" and thus support an award of attorney's fees. See, e.g., *Centaur Commc'ns. Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1229 (2d Cir. 1987)*; see also *Springs Mills, Inc. v. Ultracashmere House, Ltd., 724 F.2d 352, 357 (2d Cir. 1983)* (ruling that district court abused its discretion in failing to consider award of attorneys' fees in case involving willful infringement).

Having concluded that the defendant's conduct was willful, we further find that an award of reasonable attorney's fees is appropriate.

CONCLUSION

For the reasons noted, we conclude that plaintiffs are entitled to recover $7,200,000.00 as disgorgement of profits from the sale of counterfeit Chloé products, as well as reasonable fees and costs. Plaintiffs may serve and file an affidavit with a summary of the costs and fees associated with prosecuting this proceeding and contemporaneous time records by no later than **FRIDAY, JULY 31, 2009**. Defendant Zar may serve and file responding papers by **FRIDAY, AUGUST 7, 2009**.

Pursuant to *Rule 72 of the Federal Rules of Civil Procedure*, the parties shall have ten (10) days from this date to file written objections to this **[*22]** Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Richard J. Holwell, Room 1950, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District court and on later appeal to the United States Court of Appeals. See *Thomas v. Arn, 474 U.S. 140, 150, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; *Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989)*; *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72*, *6(a)*, *6(e)*.

**Dated: New York, New York**

**July 16, 2009**

/s/ Michael H. Dolinger

**MICHAEL H. DOLINGER**

**UNITED STATES MAGISTRATE JUDGE**

---

# *Deckers Outdoor Corp. v. ShoeScandal.com, LLC*

United States District Court for the Central District of California

November 25, 2013, Decided; November 25, 2013, Filed

Case No. CV 12-7382 ODW (SHx)

**Reporter**

2013 U.S. Dist. LEXIS 168545 *; 2013 WL 6185203

DECKERS OUTDOOR CORPORATION, a Delaware Corporation, Plaintiff, v. SHOESCANDAL.COM, LLC, a Nevada Limited Liability Company; and DOES 1-10, inclusive, Defendants.

**Prior History:** *Deckers Outdoor Corp. v. ShoeScandal.com, LLC, 2013 U.S. Dist. LEXIS 111407 (C.D. Cal., Aug. 7, 2013)*

## Core Terms

ShoeScandal's, infringement, damages, default, profits, default judgment, attorney's fees, willful, percent, costs, patent, post-judgment, award of damages, pre-judgment, patentee, awards, margin, sales

**Counsel:** **[*1]** For Deckers Outdoor Corporation, a Delaware corporation, Plaintiff: Brent H Blakely, Cindy W Chan, Blakely Law Group, Manhattan Beach, CA.

**Judges:** OTIS D. WRIGHT, II, UNITED STATES DISTRICT JUDGE.

**Opinion by:** OTIS D. WRIGHT, II

## Opinion

**ORDER GRANTING PLAINTIFF'S REQUEST FOR AWARD OF DAMAGES IN DEFAULT JUDGMENT [28]**

## I. INTRODUCTION

On August 7, 2013, the Court entered default judgment as to liability against Defendant ShoeScandal.com, LLC. (ECF No. 27.) The Court denied the initial request for damages because Deckers Outdoor Corporation's submitted evidence of ShoeScandal's profits was too speculative. (*Id.*) Deckers filed a renewed request for an award of damages under *35 U.S.C. § 289* August 23, 2013 (ECF No. 28.) In light of Deckers's supplemental evidence regarding typical industry profits, the Court **GRANTS** Deckers's Request for Damages.[1]

## II. FACTUAL BACKGROUND

On August 28, 2012, Deckers sued ShoeScandal for patent infringement and unfair competition regarding the purchase and sale of goods with designs nearly identical to Deckers's federally-registered design patents. (ECF No. 1.) Deckers holds multiple **[*2]** design patents for its famous UGG® Australia line of footwear. Defendant ShoeScandal.com advertises, offers for sale, and sells shoes through its online store *www.shoescandal.com*. (Compl. ¶ 13.) An image comparison is provided below. (*See* Compl. ¶ 14.)



Ugg Design Patent No. D599,999    Defendant's Infringing Product

Ugg Design Patent No. D616,189    Defendant's Infringing Product

On October 15, 2012, the Clerk of Court entered default against ShoeScandal under *Federal Rule of Civil Procedure 55(a)*. (ECF No. 13.) Following entry of default, Deckers filed an Application for Default

---

[1] The Court deems this matter appropriate for decision without oral argument. *Fed. R. Civ. P. 78*; **C.D. Cal. L.R. 7-15**.

Judgment seeking injunctive relief and an award of $500,000.00, in addition to costs and post-judgment interest. (ECF No. 25.) On August 7, 2013, the Court granted Deckers's Application with respect to liability, costs, and injunctive relief, but denied Deckers's request for damages without prejudice. (ECF No. 27.)

The Court denied the damages request because Deckers failed to adequately prove its damages. (*Id.*) Rather than seek damages in the form of a reasonable-royalty under *§ 284*, Deckers sought ShoeScandal's profits from the sale of the infringing products under *§ 289*. (ECF No. 25.) But because ShoeScandal failed to appear in this action, Deckers sought to prove ShoeScandal's profits through an invoice produced by Ollie's Bargain **[*3]** Outlet—a retailer to whom ShoeScandal allegedly sold the infringing boots in an unrelated action pending in the Southern District of New York. (*Id.*; Chan Decl. ¶ 7.) Deckers improperly equated ShoeScandal's total "earned revenue" with its total profits in its request.

On August 23, 2013, Deckers renewed its request for damages. (ECF No. 33.) Deckers sought $230,000.00 in damages, again based on ShoeScandal's sales of the infringing boots to Ollie's Bargain Outlet. (*Id.*) Deckers noted that Ollie's Bargain Outlet's invoice reflected that ShoeScandal sold at least 39,780 units of the infringing boots and earned revenues in the amount of $238,282.20. (*Id.*) But although Deckers decreased the requested damages amount, Deckers did not provide the Court with any evidence of ShoeScandal's profits. Instead, Deckers requested 50 percent of ShoeScandal's gross revenues. (*Id.*) The Court issued an Order for supplemental briefing on September 26, 2013, requesting that Deckers provide some evidence of ShoeScandal's profits. (ECF No. 37.) On October 25, 2013, Deckers responded to the Court's Order by filing a declaration from Nellie Poole, Deckers's Vice President of Supply Chain. (ECF No. 38.)

### III. **[*4]** LEGAL STANDARD

*Federal Rule of Civil Procedure 55(b)* authorizes a district court to grant default judgment after the Clerk enters default under *Rule 55(a)*. *Local Rule 55-1* requires that the movant submit a declaration establishing (1) when and against which party default was entered; (2) identification of the pleading to which default was entered; (3) whether the defaulting party is a minor, incompetent person, or active servicemember; and (4) that the defaulting party was properly served

with notice.

A district court has discretion whether to enter a default judgment. *Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980)*. Upon default, the defendant's liability generally is conclusively established, and the well-pleaded factual allegations in the complaint are accepted as true. *Televideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987)* (per curiam) (citing *Geddes v. United Fin. Grp., 559 F.2d 557, 560 (9th Cir. 1977))*.

But a Plaintiff must prove all damages sought in the complaint. *Phillip Morris USA, Inc. v. Castworld Prods., 219 F.R.D. 494, 498 (C.D. Cal. 2003)*. If the facts necessary to determine damages are not contained in the complaint, or are legally insufficient, **[*5]** they will not be established by default. *Cripps v. Life Ins. Co. of N. America, 980 F.2d 1261, 1267 (9th Cir. 1992)*. Fundamental fairness, required by due process of law, limits the scope of relief. *U.S. Const. amend. XIV*.

### IV. DISCUSSION

In the Renewed Request for Award of Damage in Default Judgment, Deckers seeks judgment in the sum of $258,270.05 in statutory damages, reasonable attorneys' fees in accordance with *Local Rule 55-3*, and prejudgment interest, as well as costs and postjudgment interest. (ECF No. 33.) The Court considers each in turn.

### A. Statutory Damages

Deckers first seeks a statutory-damages award of $119,141.10—which reflects a presumed 50 percent profit by ShoeScandal on its $238,282.20 sales to Ollie's Bargain Outlet. This presumed profit is based upon the typical profit margin for footwear distributors of 40-50 percent. (Poole Decl. ¶¶ 5-6.) Under *35 U.S.C. § 284*, a design-patent patentee may recover compensatory damages from the infringer, but in no event less than a reasonable royalty. Alternatively, the patentee may elect to recover the infringer's total profits (but no less than $250) under *35 U.S.C. § 289*. And when only a design patent is at issue, a patentee may **[*6]** not recover both infringer profits under *§ 289* and additional damages, such as a reasonable royalty, under *§ 284*. *Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1291 (Fed Cir. 2002)*.

Rather than seek damages under *§ 284*, Deckers seeks ShoeScandal's profits from the sale of the infringing products under *§ 289*. (Mot. 3.) Under normal circumstances, it is the infringer who bears the burden of "offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue." *Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd., 311 B.R. 378, 401 (S.D.N.Y. 2004)* aff'd, *153 F. App'x 703 (Fed. Cir. 2005)*. But if the infringer has failed to produce any evidence—as in the default action at hand—the Court must determine the costs to be subtracted from revenue based on the evidence it has to determine profits. See *Nike, Inc. v. Wal-Mart Stores, Inc., 138 F.3d 1437, 1447 (Fed. Cir. 1998)*.

ShoeScandal has not responded to, nor produced any discovery in, this action, so Deckers has limited information regarding ShoeScandal's sales and profits. The invoice produced by Ollie's Bargain Outlet shows that ShoeScandal has sold at least 39,780 units **[*7]** of the infringing products, resulting in $238,282.20 in sales to Ollie's alone. (Poole Decl. ¶ 6.) But ShoeScandal's total *sales* are not its total *profits*. In arriving at ShoeScandal's total-profit figure under *§ 289*, Deckers cannot look solely to ShoeScandal's gross sales figures. Rather, it must subtract from the gross sales all of ShoeScandal's direct and indirect expenses. See *Nike, 138 F.3d at 1447*.

The Court finds evidence of the typical profit margin in the footwear industry sufficient for an award of damages on default. The ascertainment of the amount of damages is not certain, but it would be fundamentally unfair to deny all relief to Deckers. "The wrongdoer is not entitled to complain that [the damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." However, the Court declines to grant the statutory damages as requested. The Court must balance the concern of fairness to an absent party against the risk that minimizing damages would motivate infringing parties to simply ignore infringement complaints. Instead the Court finds a statutory award of **$107,226.99**—based on a 45 percent **[*8]** profit margin—reasonable in this case. A profit margin of 45 percent represents an average of the 40-50 percent profit margin typical in the industry and adequately balances fairness and deterrence. (Poole Decl. ¶¶ 5-6.)

**B. Attorney's Fees and Costs**

Deckers also requests an award of reasonable attorneys' fees under *§ 285*. Under *§ 285*, the Court must first determine that a case is "exceptional" and then it may exercise its discretion to award fees to the prevailing party. The standard for determining whether a case is exceptional under *§ 285* is set forth in *Brooks Furniture Manufacturing, Inc. v. Dutailier International Inc., 393 F.3d 1378 (Fed. Cir. 2005)*. There, the Federal Circuit held that an award of attorneys' fees is permissible "when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates *Fed. R. Civ. P. 11*, or like infractions." *Brooks, 393 F.3d at 1381*. Indeed, the Federal Circuit has stated that attorneys' fees should be awarded "only when it would be unjust not to make such **[*9]** an award." *Rohm & Haas Co. v. Crystal Chem. Co., 736 F.2d 688, 692 (Fed. Cir. 1984)*. Thus, a court must predicate an attorneys'-fees award on something beyond the mere fact that the patentee has prevailed.

Here, Deckers alleged that ShoeScandal sold and offered for sale the infringing shoes "knowingly and intentionally," and that this conduct "constitute[d] willful acts and intentional infringement." (Compl. ¶¶ 19, 23.) Deckers further asserts that, by failing to respond to its Complaint, ShoeScandal is deemed to have admitted that it willfully infringed Deckers's design patent. But the fact that a default judgment was entered against ShoeScandal does not alone make this case exceptional—despite the default finding of willfulness. Accord *Telequip Corp. v. The Change Exch., No. 5:01-CV-1748, 2007 U.S. Dist. LEXIS 13047, 2007 WL 655734, at *2 (N.D.N.Y. Feb. 26, 2007)* (denying patentee's motion for attorneys' fees and noting that "neither willful infringement nor defaults are unusual in patent-infringement cases."); *Cequent Trailer Prods., Inc. v. Intradin (Shanghai) Mach. Co., Ltd., No. 1:05-CV-2566, 2007 U.S. Dist. LEXIS 33393, 2007 WL 438140, at *11 (N.D. Ohio Feb. 7, 2007)* (awarding treble damages for willful infringement but refusing to **[*10]** award attorneys' fees on default).

Courts have awarded attorneys' fees under *35 U.S.C. § 285* for willful infringement. *Nat'l Gypsum Co. v. Steel Sys. Int'l, Inc., 696 F. Supp. 1379 (D. Or. 1988)*; C*haparral Indus., Inc. v. Boman Indus., Inc., 697 F. Supp. 1113 (C.D. Cal. 1988)*. And such an award has been upheld by the Federal Circuit. *Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d*

*1075 (Fed. Cir. 1987)*. But although a finding of willful infringement is a sufficient basis for finding a case exceptional, it does not compel such a finding. *Tate Access Floors, Inc. v. Maxcess Techs., Inc., 222 F.3d 958, 972 (Fed. Cir. 2000)*; *Jurgens v. CBK, Ltd., 80 F .3d 1566, 1572 (Fed. Cir. 1996)*; *Avia Group Intern., Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1567 (Fed. Cir. 1988)*..

The bare default finding of willful infringement is insufficient evidence of exceptional circumstances to warrant an attorneys'-fees award. Attorneys' fees are not awarded as a matter of course, and should not be permitted in the ordinary, typical patent suit. Neither default judgments nor willful infringement are uncommon in patent-infringement cases. **[*11]** The Court is not willing to categorize a default finding of willfulness as exceptional without some additional extraordinary circumstances plead in the complaint. An attorneys'-fees award should be premised upon a finding of unfairness, bad faith, or other equitable consideration of similar force that makes it grossly unjust that the prevailing party be left to bear the burden of its counsel's fees. Deckers's complaint does not allege such circumstances here.

This is not to say that the Court condones ShoeScandal's actions—it intentionally failed to participate in this action. But although ShoeScandal is blameworthy for its failure to file responsive pleadings, this is not sufficiently exceptional to warrant an attorneys'-fees award.

Deckers is entitled to recover the costs incurred in litigating this action "upon finding for the claimant." *35 U.S.C. § 284*. Accordingly, the Court **GRANTS** Deckers's request for costs, subject to proof in an application to tax costs under *Local Rule 54-2.1*.

### C. Pre- and Post-Judgment Interest

It is within the Court's discretion to award pre-judgment interest in design-patent infringement actions. *See Catalina Lighting, 295 F.3d at 1292*. Under *28 U.S.C. § 1961(a)*, **[*12]** "interest shall be allowed on any money judgment in a civil case recovered in a district court." Absent substantial evidence that a different pre-judgment interest rate is appropriate, the rate of prejudgment interest is the Treasury Bill rate as defined in *28 U.S.C. § 1961*. *U.S. v. Gordon, 393 F.3d 1044, 1058 n.12 (9th Cir. 2004)*; *see also Blanton v. Anzalone (II), 813 F.2d 1574, 1576 (9th Cir.1987)*; *Cyclone USA, Inc. v. LL & C Dealer Servs., LLC, CV 03-992 AJW,*

*2010 U.S. Dist. LEXIS 51171, 2010 WL 2132378, at *2 (C.D. Cal. May 24, 2010)*. The Treasury Bill rate is equal to the weekly average one-year constant maturity Treasury yield for the calendar week preceding the date of the judgment as the appropriate rate for interest. *28 U.S.C. § 1961(a)*. The Court therefore awards Deckers **$14,913.22** in pre-judgment interest from June 25, 2012, through November 20, 2013.[2]

Deckers is entitled to post-judgment **[*13]** interest on their monetary award under *28 U.S.C. § 1961(a)*. Further, interest is computed daily until the date of payment. *Id.§ 1961(b)*. The Court therefore awards Deckers post-judgment interest at a rate of 9.8 percent from November 21, 2013, until the date of payment.

### V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Deckers's Renewed Request for an Award of Damages in Default Judgment and awards Deckers a total amount of **$122,140.21**. The Court also awards Deckers post-judgment interest at a rate of 9.8 percent from November 26, 2013, until the date of payment. Under *Local Rule 54-2.1* Deckers has fourteen days from the date of this order to submit a bill of cost. A default judgment will issue.

**IT IS SO ORDERED.**

November 25, 2013

/s/ Otis D. Wright, II

**OTIS D. WRIGHT, II**

**UNITED STATES DISTRICT JUDGE**

---

---

[2] $(((\$107,226.99 \times .098)/365) \times 518) = \$14,913.22$

The average 52-week Treasury rate for the week preceding judgment is 9.8%. Principal Amount Due is $107,226.99. The daily interest $((\$107,226.99 \times 0.098) / 365)$ is $28.79. Interest accrued from June 25, 2012, to November 25, 2013, $(\$28.79 \times 518 \text{ days})$ is equal to $14,913.22.

## *Tuf-Tite, Inc. v. Fed. Package Networks, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

November 21, 2014, Filed, Entered

Case no. 14-cv-2060

### Reporter

2014 U.S. Dist. LEXIS 163352 *; 2014 WL 6613116

TUF-TITE, INC., Plaintiff, v. FEDERAL PACKAGE NETWORKS, INC., Defendant.

## Core Terms

patent, applicator, inner, infringement, surface, dispensing, balm, lip, preliminary injunction, configuration, non-circular, specification, screw, manufacturing, turning, irreparable harm, circle, invention, circular, interact, public interest, Declaration, embodiments, projections, injunction, protrusion, stick, incremental, disclaimed, tubular

**Counsel:** **[*1]** For TUF-TITE, Inc., Plaintiff: Julianne Marie Hartzell, LEAD ATTORNEY, Jeremy R. Kriegel, Marshall, Gerstein & Borun, Chicago, IL.

For Federal Package Networks, Inc., Defendant, Counter Claimant: Theodore Adam Breiner, LEAD ATTORNEY, Breiner & Breiner, Alexandria, VA; Dennis C. Lee, Katten Muchin Rosenman LLP, Chicago, IL.

For TUF-TITE, Inc., Counter Defendant: Julianne Marie Hartzell, LEAD ATTORNEY, Marshall, Gerstein & Borun, Chicago, IL.

**Judges:** Hon. John Z. Lee, United States District Judge. Magistrate Judge Schenkier.

**Opinion by:** John Z. Lee

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff Tuf-Tite, Inc. ("Tuf-Tite") recently started to manufacture applicators for lip balm. It filed this suit seeking a declaration that its new applicator does not infringe upon a patent owned by Defendant Federal Package Networks, Inc. ("Federal Package"), which

currently supplies lip balm applicators for the maker of CARMEX® lip balm. In response, Federal Package filed a counterclaim for patent infringement along with the instant motion for preliminary injunction, asking the Court to enjoin Tuf-Tite from manufacturing or selling its applicator. For the reasons set forth below, the Court grants Federal Package's motion.

### Factual Background [*2]

Tuf-Tite is a manufacturing company located in Lake Zurich, Illinois. Compl. ¶ 4. It recently began to manufacture lip balm applicators. Declaration of Steven R. Dakolios ("Dakolios Decl.") ¶ 10.

Federal Package is a manufacturing company located in Chaska, Minnesota, that manufactures, fills, and labels containers for lip balm, cosmetics, and sunscreen. Dakolios Decl. ¶¶ 2, 3. Federal Package is one of the three main businesses in the United States providing such services to suppliers of lip balm, cosmetics, and sunscreen, *id.* ¶ 3, and currently supplies approximately twenty-five percent of the market for standard lip balm containers. *Id.* ¶ 4.

In 1998, Carma Laboratories, Inc. ("Carma"), the maker of CARMEX® lip balm, saw a need for a lip balm stick applicator which would prevent lip balm from accidentally dispensing, when it is carried in a pocket, for example. *Id.* ¶ 5. Carma asked Federal Package to develop a lip balm stick applicator to solve this problem, and Federal Package turned to one of its consultants, Frank Lang ("Lang"), for assistance. *Id.* ¶¶ 5, 6. Lang subsequently invented an applicator for the incremental dispensing of lip balm (the "Lang Invention"). *Id.* ¶ 6.

On December **[*3]** 3, 1998, Federal Package filed a patent application for the Lang Invention. *Id.* ¶ 6; Declaration of Theodore A. Breiner ("Breiner Decl.") ¶ 2, Ex. 1. Initially, the U.S. Patent and Trademark Office ("USPTO") rejected the claims of the application based on U.S. Patent No. 5,851,079 and German Published

Application No. 3118893. Declaration of Michael J. Sherman ("Sherman Decl.") ¶ 10; Breiner Decl. ¶ 7, Ex. 6. Federal Package responded to the rejection by amending the claims to make clear that the claimed incremental or "click-action" dispensing structure of the applicator provides for the lip balm to move both up and down in the container, rather than in just one direction, as described in the other patents. Breiner Decl. ¶ 8, Ex. 7. Based on the amendment, the Patent Office allowed the application and issued U.S. Patent No. 6,129,471 for the Lang Invention, entitled "Stick Applicator With Incremental Dispensing Action" (the "'471 Patent"). *Id.* ¶ 9, Exs. 1, 8.

Since 1998, Federal Package has manufactured exclusively for Carma a stick applicator with incremental dispensing action for the CARMEX® lip balm, which uses the Lang Invention. Dakolios Decl. ¶ 8. Carma uses the registered trademark CLICK STICK® for the lip balm and promotes the incremental **[*4]** or "click-action" dispensing applicator in the sale of the CARMEX® lip balm. *Id.* The applicator for the CLICK STICK® CARMEX® lip balm has been a commercial success and, Carma believes, has provided it with a marketing advantage over other lip balm manufacturers. *Id.* ¶ 9.

Between 2002 and 2013, Federal Package has manufactured and sold in excess of 180 million containers for the Carma CLICK STICK® CARMEX® lip balm, generating sales revenues in excess of $14 million. *Id.* According to Federal Package, no lip balm manufacturer has marketed a stick applicator with incremental dispensing action. *Id.* ¶ 13. Federal Package and Carma do not have a written contract governing their relationship, but have done business exclusively for fifteen years based on a handshake agreement. 6/30/14 Hearing Tr. at 33-34.

In March 2014, Federal Package learned that Tuf-Tite intended to begin to manufacture and sell a lip balm applicator (the "INPRES applicator"). Dakolios Decl. ¶ 11. According to Federal Package, Tuf-Tite has manufactured a number of the INPRES applicators as samples and offered them for sale to various potential customers, including some of Federal Package's existing customers. *Id.* Federal **[*5]** Package does not believe (and Tuf-Tite's counsel conceded at oral argument) that Tuf-Tite has as yet sold any INPRES applicators, *id,* and this was confirmed by Tuf-Tite's counsel at oral argument.

On March 19, 2014, Federal Package's counsel wrote to Tuf-Tite to notify it of the existence of the '471 patent.

Dakolios Decl. ¶ 12; Breiner Decl. ¶ 4; Dkt. 21 at Ex. 3. In response, on March 24, 2014, Tuf-Tite filed the instant action, seeking a declaration of non-infringement. Tuf-Tite notified Federal Package of the filing of the case by letter dated March 26, 2014. Dakolios Decl. ¶ 12; Breiner Decl. ¶ 5; Dkt. 21 at Ex. 4. The March 26 letter stated that the INPRES applicator did not infringe on the '471 patent because it did not include a base wall having an inner wall surface of a non-circular configuration. Dkt. 21 at Ex. 4. On April 4, 2014, Federal Package responded by letter, stating in relevant part, that the INPRES applicator includes a base wall having an inner wall surface of non-circular configuration. Dakolios Decl. ¶ 12; Breiner Decl. ¶ 6; Dkt. 21 at Ex. 5. Federal Package subsequently filed its counterclaim for infringement along with the instant motion. Dkt. 15; Dkt. 18 at 1.

## Legal Standard

The **[*6]** Federal Circuit has explained that "'[t]he grant, denial, or modification of a preliminary injunction . . . is not unique to patent law, so this court applies the law of the regional circuit when reviewing and interpreting such a decision.'" *Trebro Mfg., Inc., v. Firefly Equip., LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014)* (quoting *Aevoe Corp. v. AE Tech Co., 727 F.3d 1375, 1381 (Fed. Cir. 2013)).* "However, 'the Federal Circuit has itself built a body of precedent applying the [ ] general [preliminary injunction] considerations to a large number of factually variant patent cases, and [ ] give[s] dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues." *Id.* (quoting *Mikohn Gaming Corp. v. Acres Gaming, Inc., 165 F.3d 891, 894 (Fed. Cir. 1998)).* Therefore, the Court will apply the Seventh Circuit standards governing preliminary injunctions throughout this opinion, except where patent-specific considerations are in play.

Seventh Circuit precedent requires the Court to engage in a two-phase analysis when considering whether to issue a preliminary injunction: a threshold phase and a balancing phase. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the USA, Inc., 549 F.3d 1079, 1085-86 (7th Cir. 2008).* "To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements." *Id. at 1086.* First, the party must show that it will suffer irreparable harm without the injunction. Second, the party must demonstrate that traditional legal remedies would **[*7]** be inadequate. Third, the party must establish that its claim has some likelihood of succeeding on the merits. If the party cannot make a

showing as to each of these threshold requirements, the preliminary injunction must be denied. *Id.*; *see also Cox v. City of Chi., 868 F.2d 217, 223 (7th Cir. 1989)* ("If a plaintiff fails to meet just one of the prerequisites for a preliminary injunction, the injunction must be denied."). Assuming that, the party meets this initial threshold, the Court proceeds to the balancing phase of the analysis. *Girl Scouts, 549 F.3d at 1086*.

During the balancing phase, the party seeking the injunction must demonstrate that its harm in the absence of such relief outweighs any harm that may be suffered by the non-moving party if the injunction is granted. *Id*. In making this determination, the Court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor." *Id*. (quoting *Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 389 (7th Cir. 1984))*. Additionally, where appropriate, this balancing process "should . . . encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Id*. (quoting **[*8]** *Ty, Inc. v. Jones Grp., Inc., 237 F.3d 891, 895 (7th Cir. 2001))*. Taking into account all of these considerations, the Court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id*. (internal citations and quotations omitted).

The standard for the issuance of preliminary injunctions in the Federal Circuit differs only slightly. There, "[w]hether a preliminary injunction should issue turns upon four factors: (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in its favor; and (4) the adverse impact on the public interest." *Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1555 (Fed. Cir. 1994)* (citing *Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988))*. "The burden is always on the movant to show entitlement to a preliminary injunction." *Id*. (citing *H.H. Robertson Co. v. United Steel Deck, Inc., 820 F.2d 384, 388 (Fed. Cir. 1987))*. Out of these factors, the most critical factors are likelihood of success on the merits and irreparable harm. "[A] movant cannot be granted a preliminary injunction without findings by the district court that the movant carried its burden on *both* factors." *Id. at 1556* (emphasis in original).

## Analysis

## I. Likelihood of Success

In order to prevail on its motion, Federal Package **[*9]** must demonstrate that it has some likelihood of succeeding on the merits of its claim. *See Girl Scouts, 549 F.3d at 1096*. "A reasonable likelihood of success requires a showing of validity and infringement." *Reebok, 32 F.3d at 1555*. In patent cases, "[t]his factor . . . depends fundamentally on the meaning of the asserted claim and its relationship to the accused product or process. Therefore, a correct claim construction is almost always a prerequisite for imposition of a preliminary injunction." *Chamberlain Grp., Inc. v. Lear Corp., 516 F.3d 1331, 1339-40 (Fed. Cir. 2008)*. The validity of the '471 Patent is not in dispute, *see* Dkt. 34 at 2; therefore, the Court need only construe any claims in dispute and then proceed to the question of infringement. *See Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995)* (en banc), aff'd, *517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996)* (to determine infringement, Court must interpret claims and then apply them to the allegedly infringing product).

### A. Claim Construction

### 1. Standard Governing Claim Construction

Claim construction is a question of law to be decided by the Court. *See Markman v. Westview Instruments, Inc., 517 U.S. 370, 391, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996)*. The Court first looks to intrinsic evidence, which consists of the patent claims, specification, and prosecution history. *See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)*. Words "are generally given their ordinary and customary meaning," *id.*, which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time **[*10]** of the invention . . . ." *Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005)*.

Terms are given "the meaning and scope with which they are used in the specification and the prosecution history." *Kinik Co. v. ITC, 362 F.3d 1359, 1365 (Fed. Cir. 2004)*. The specification is usually "dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics, 90 F.3d at 1582*. However, a particular embodiment used in the specification to aid understanding should not import limitations into the claim. *Superglide Corp. v. DirecTV Enters., Inc., 358*

*F.3d 870, 875 (Fed. Cir. 2004)*. Nonetheless, a claim may be limited to its preferred embodiment if permitting expansive claim language would undermine the public notice requirements of *35 U.S.C. § 112*. *LizardTech, Inc. v. Earth Resource Mapping, Inc., 424 F.3d 1336, 1346 (Fed. Cir. 2005)*. As for the prosecution history, it may serve to further "exclude any interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005)*. However, a claim may not be narrowed "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)*.

Extrinsic evidence, such as dictionaries and expert testimony, may be used. But such use is limited to those circumstances where the intrinsic evidence alone is insufficient to determine the meaning of the claim terms. *Vitronics, 90 F.3d at 1583*.

Finally, the doctrine of "claim differentiation" provides that "each claim in a patent is presumptively different in scope." *RF Del., Inc. v. Pac. Keystone Techs., Inc., 326 F.3d 1255, 1263 (Fed. Cir. 2003)*. "That presumption **[*11]** is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim." *Acumed LLC v. Stryker Corp., 483 F.3d 800, 806 (Fed. Cir. 2007)*. However, it must be noted that claim differentiation is a "rule of thumb" and not absolute. *Edwards Lifesciences LLC v. Cook, Inc., 582 F.3d 1322, 1332 (Fed. Cir. 2009)*. The scope of a claim may be limited so as to create redundant claims if required by "the clear import of the specification," *id.*, or by the prosecution history. *See Fantasy Sports Properties, Inc. v. Sportsline.com, Inc., 287 F.3d 1108, 1116 (Fed. Cir. 2002)* (presumption of claim differentiation overcome by disclaimer during prosecution history).

## 2. Construction of Disputed Claim

Federal Package asserts that Tuf-Tite's INPRES applicator infringes claim 1 of the '471 patent. Claim 1 calls for:

A screw operated applicator for incremental dispensing comprising: a tubular body including an open dispensing end and a base wall having at least one hole through the base wall; a threaded movable support inside said tubular body, said support being in contact with an inner wall of said tubular body so as to prevent rotation of the support in the body;

a rotatable dispensing screw including a control member disposed adjacent said base wall, a raised portion including at least one protrusion, a snap member and a threaded shaft extending through said hole in the base wall into said **[*12]** tubular body and along a substantial length of said tubular body, said threaded shaft being threadably engaged with said support; wherein said base wall includes *an inner wall surface of a non-circular configuration* which surrounds in use said raised portion of the dispensing screw such that said at least one protrusion interacts with said inner wall surface to provide resistance to turning of said control member and to create at least two favored control member orientations; and wherein said rotatable dispensing screw rotates to cause said support to move up or down in relation to said tubular body based on direction of turning of said control member.

Dkt. 21 Ex. 1 ("'471 Patent") at 5:6 - 6:9 (emphasis added). The dispute between the parties comes down to the following question: does Tuf-Tite's INPRES applicator include "an inner wall surface of a non-circular configuration?"

Federal Package asks the Court to construe this claim to mean any surface that is not a simple, unadulterated circle. *See* Federal Package Reply Br. at 10 (construing phrase as "an inner wall surface which is not a circle"). On the other hand, Tuf-Tite proposes that "non-circular configuration" means "an arrangement of parts **[*13]** in a shape that manifests discrete sides and excludes any arrangement that outlines a circle, including a circular wall with projections." *See* Tuf-Tite Resp. Br. 9. It is worth noting that the first proposed construction ("A") is inclusive of the second ("B"), while B is narrower than A.



In deciding which construction is proper, the Court first turns to the intrinsic evidence, beginning with the language of the patent claim itself. *See Vitronics, 90 F.3d at 1582*. As a threshold matter, the phrase "an

inner wall surface of a non-circular configuration," as it appears in the claim, is not particularly helpful, because it does not state with any clarity whether "non-circular configuration" means (A) any shape that is not a circle, or (B) any shape that has discrete sides and does not have elements (such as projections) arranged in a circular fashion. But claim 1 further teaches that "at least one protrusion [from the dispensing screw] interacts with said inner wall surface to provide resistance to turning of said control member and to create at least two favored control member orientations." '471 Patent at 6:3 - 6. In other words, the inner surface must have some element that provides resistance to a protrusion emanating [*14] from the dispensing screw. This reading is further supported by the specification.[1] Thus, when construed in conjunction with the other elements of the claim, see *Phillips, 415 F.3d at 1313*, "non-circular configuration" means, at the very least, that the inner surface cannot be a shape that is a simple circle. The question remains, however, whether the intrinsic evidence also requires that the construction of the term be limited further to "an arrangement of parts in a shape that manifests discrete sides and excludes any arrangement that outlines a

---

[1] The specification contains numerous references to the interaction between the inner wall surface and the dispensing screw:

> Protrusions on the dispensing screw interact with the base wall of the body to provide resistance to the smooth rotation of the control member and cause the control member to favor certain predetermined positions. The base wall includes an inner wall surface at its lower end which interacts with the protrusions to provide click action and, thus, controlled incremental dispensing.

'471 Patent, Abstract.

> Turning of the control member of the dispensing [*15] screw turns the threaded shaft which in turn causes the support to move up or down inside the tubular body with concomitant extension or retraction of product from the open dispensing end of the body.

*Id.*, 2:38 - 42.

> [T]he dispensing screw has at least one protrusion on or near the control member that interacts with a specially configured wall structure present in the tubular body to interfere with or resist continuous or uncontrolled turning of the control member. The effect is that the control member stops at certain predetermined orientations upon turning and further turning by a user is required for continued turning and thus dispensing.

*Id.*, 2: 46 - 54.

circle, including a circular wall with projections," as Tuf-Tite contends. The Court concludes that it does not.

First, Tuf-Tite argues that the Court need only rely on the "plain and ordinary meaning" of the phrase to adopt its construction. But such a construction is not helpful when one considers the claim language and the specification. Take, for example, figure 4 of the patent, which depicts a preferred embodiment with an inner wall that consists of eight sides of equal length.



Not only can the arrangement of the eight sides be described as having an "outline" (depicted in figure 4 as a red circle) that is "shaped like a circle," but as one increases [*16] the number of sides of the inner wall (say to 16 or 32 sides of equal length), the "outline" of the inner wall becomes more and more "shaped like a circle." Under Tuf-Tite's "plain meaning" construction, such a device would be excluded from the scope of the patent, even though it is disclosed in the specification.[2]

Next, Tuf-Tite points to the specification and the embodiments depicted in figures 4, 5 and 6, arguing that, '[i]n each of the multiple embodiments described, the corners of the multi-sided shape interact with a protrusion located on the dispensing screw [*17] to create a clicking action when a user turns the control knob." Tuf-Tite Resp. Br. 6. From this, Tuf-Tite asserts that the patent discloses only inner walls with multiples sides and a corner. *Id.* 5 - 6.

Tuf-Tite's description of the preferred embodiments may be correct, but it is hornbook law that the limitations from the specification should not be read into the claim

---

[2] During oral argument, Tuf-Tite's counsel pointed to a circular saw as an example of an item with a circular configuration. 5/7/14 Hearing Tr. at 8:21-24, 11:11-25. According to Tuf-Tite, a device that has an inner wall with a number of projections extending inward towards the center where the tips of the projections form a circular shape would not fall within the scope of the term "non-circular configuration." Dkt. 30 at 5. But, by focusing on the tips of the projections, Tuf-Tite's construction does not do justice to the actual wording of the claim, which discloses "an inner wall *surface*" that has a "non-circular configuration."

itself. *See Superglide, 358 F.3d at 875*; *see also Phillips, 415 F.3d at 1323* (courts should "avoid the danger of reading limitations from the specifications into the claim"). This is particularly true here, where the specification expressly states that "[v]arious embodiments of the present invention are available. Numerous inner wall surface configurations are possible according to the principle of click-action interaction between a base wall and a screw member as described above." '471 Patent at 4:48 - 52.[3]

Furthermore, adopting the construction proposed by Tuf-Tite would offend the doctrine of claim differentiation. **[*18]** Claim 4, which is a dependent claim, teaches an "applicator according to claim 1 wherein said inner wall surface of the base wall has a multi-sided configuration with each side being of substantially equal length." '471 Patent at 6:14 - 17. As Federal Package correctly notes, this description covers the preferred embodiments illustrated in figures 4, 5, and 6 of the patent — each figure depicts an inner wall surface that has discrete sides. Thus, under the doctrine of claim differentiation, claim 1 must necessarily be broader in scope than claim 4, and the term "non-circular configuration" in claim 1 must encompass more than "an arrangement of parts in a shape that manifests discrete sides," as Tuf-Tite contends. *Trebro Mfg., 748 F.3d at 1167*.

Finally, Tuf-Tite argues that Federal Package's January 11, 2000, amendment to its claims constituted a prosecution disclaimer that defeats Federal Package's proposed construction. Specifically, Tuf-Tite asserts that when Federal Package amended its patent application after the initial rejection, it "expressly disclaimed the structure" of the two patents cited by the examiner as "both generally circular in cross-section with projections that impede movement, from coverage by the language **[*19]** of claim 1." Tuf-Tite Resp. Br. 10. Therefore, Tuf-Tite asserts, Federal Package has expressly disclaimed any definition of non-circular configuration "that encompasses circular cross-sections with any element that impedes movement. . . ." *Id.*

In order for the Court to conclude that Federal Package's current construction was disclaimed during prosecution, the disclaimer must have been reasonably clear and deliberate. *See N. Telecom Ltd. v. Samsung Elecs. Co., 215 F.3d 1281, 1294 (Fed. Cir. 2000)*. The record does not demonstrate that a reasonably clear disclaimer occurred. The claim language at issue, "an inner wall surface of a non-circular configuration," was part of the original claim filed by the patentee, and this portion of the claim was never amended by Federal Package. Furthermore, in its submission to the USPTO, Federal Package did not narrow the meaning of the term "inner wall surface of a non-circular configuration" from that originally claimed, other than to inform the patent examiner that the dispensing screw and inner wall surface allowed for bidirectional, as opposed to unidirectional, movement. Breiner Decl. ¶ 8, Ex. 7. Thus, Tuf-Tite's reliance upon the prosecution history is unavailing.

For all of the foregoing reasons, the Court adopts Federal **[*20]** Package's proposed construction and construes the phrase "inner wall surface of a non-circular configuration" to mean "an inner wall surface which is not a circle."[4]

## B. Infringement

Once the Court has construed the claims at issue, it must apply them to the allegedly infringing product to determine whether it is, in fact, infringing. *Markman, 52 F.3d at 976*. A party establishes infringement in one of two ways: literal infringement of the claim language or infringement under the doctrine of equivalents. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 35, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)*. Literal infringement occurs where the allegedly infringing device includes all elements of the claim. *Trebro Mfg., 748 F.3d at 1166*. Infringement under the doctrine of equivalents occurs where **[*21]** the allegedly infringing device "performs substantially the same function in substantially the same way to obtain the same result" as the patented product. *Graver Tank & Mfg. Co. v. Linde*

---

[3] Additionally, the patent provides that "various modifications can be made within the scope of the aforesaid description. Such modifications being within the ability of one skilled in the art form a part of the present invention and are embraced by the appended claims." *Id.* at 5:1 - 5.

[4] Tuf-Tite also argues, albeit very perfunctorily, that if the Court were to adopt Federal Package's construction, the patent would violate the written description requirement of *35 U.S.C. §112*. Tuf-Tite Resp. Br. at 14-15. But, this contention is based entirely upon Tuf-Tite's own claim construction and interpretation of the specification (for example, it again argues that "there is no disclosure of any invention that uses an inner wall with a circular outline" and cites to the same prosecution history). For the reasons discussed above, this argument also fails.

*Air Prods. Co., 339 U.S. 605, 608, 70 S. Ct. 854, 94 L. Ed. 1097, 1950 Dec. Comm'r Pat. 597 (1950)*. Neither manner of infringement requires proof of intent to infringe. *Warner-Jenkinson, 520 U.S. at 35*.

Here, the Court finds that Federal Package has a reasonable likelihood of succeeding on the merits of its infringement claim. Tuf-Tite's INPRES applicator's base and inner wall surface appear as follows:



Federal Package argues that the INPRES applicator features a base wall with an inner wall surface that is of a non-circular configuration due to the outward projections in the inner wall surface, which interact with the dispensing screw to provide resistance to the turning of the screw in dispensing the product. Sherman Decl. ¶¶ 6-8. As Federal Package points out, if the inner wall surface were circular, with no outward projections, "the two protrusions on the INPRES applicator would have nothing to interact with." Dkt. 20 at 8. As noted above, the Court construes the term, "an inner wall surface of a non-circular configuration," to mean "an inner wall surface which is not a circle." Here, the Court finds that the INPRES applicator is comprised of an inner wall **[*22]** surface that is not a circle and thus literally infringes upon the '471 patent. Accordingly, Federal Package is likely to succeed on the merits of its direct infringement counterclaim.[5]

_____

[5] Because the Court finds that Federal Package has demonstrated a likelihood of success with respect to its infringement claim based upon a theory of literal infringement, it need not address Federal Package's alternative theory based upon the doctrine of equivalents. *See Teva Pharms. USA, Inc. v. Sandoz, Inc., 723 F.3d 1363, 1375 (Fed. Cir. 2013)* (where court determined defendant literally infringed,

## II. Irreparable Harm

The second threshold requirement that an injured party must satisfy in order to obtain preliminary injunctive relief is to demonstrate that it will suffer irreparable harm in the absence of the relief it seeks. *See Girl Scouts, 549 F.3d at 1086*; *see also Reebok, 32 F.3d at 1556*. While the Federal Circuit held in the past that "a movant who clearly establishes the first factor receives the benefit of a presumption on the second," *Reebok, 32 F.3d at 1556*, that is no longer the law. *See Apple Inc. v. Samsung Electronics Co., Ltd., 735 F.3d 1352, 1359 (Fed. Cir. 2013)* (citing *Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1148 (Fed. Cir. 2011)* (no presumption of irreparable harm upon finding of patent infringement). Thus, Federal Package must satisfy an independent burden of establishing irreparable harm.

Furthermore, it is important **[*23]** to bear in mind that "[t]he patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money." *Reebok, 32 F.3d at 1557* (citing *Hybritech, 849 F.2d at 1457*). Moreover, "[b]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Id.* (citing *Hybritech, 849 F.2d at 1456-57*). Along these lines, the Federal Circuit has noted that "[h]arm to reputation resulting from confusion between an inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure." *Id. at 1558*. *See also Trebro, 748 F.3d at 1170* ("likely loss of market share and loss of access to customers . . . are pertinent to the irreparable harm inquiry"); *Atlas Powder Co. v. Ireco Chems., 773 F.2d 1230, 1233 (Fed. Cir. 1985)* ("While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy against future infringement. The patent statute further provides injunctive relief to preserve the legal interests of the parties *against future infringement* which may have market effects never fully **[*24]** compensable in money.").

According to Federal Package, it will be irreparably harmed in the absence of an injunction because it will

_____

did not need to address arguments regarding doctrine of equivalents.

suffer from price erosion, loss of market share, lost sales, and loss of goodwill from its customer base. 6/30/14 Hearing Tr. at 29-32. The Dakolios Declaration further supports these contentions. Dakolios Decl. ¶¶ 13-16. The Court finds that the evidence Federal Package has put forth in this regard is sufficient to meet its burden as to irreparable harm. *See Trebro, 748 F.3d at 1170* (testimony regarding potential harm to reputation in the marketplace and loss of market share sufficient to establish irreparable harm).

### III. Balancing of Hardships

In the third prong of the preliminary injunction analysis, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Hybritech, 849 F.2d at 1457* (citing *H.H. Robertson, 820 F.2d at 390*) ("[t]he district court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted."). "The more likely **[*25]** it is that [the movant] will win its case on the merits, the less the balance of harms need weigh in its favor." *Girl Scouts, 549 F.3d at 1100*. The Seventh Circuit considers the question of the potential impact of the injunction on the public interest in conjunction with the balancing analysis, *see id. at 1100*, while the Federal Circuit considers the effect on the public interest as a separate prong of its preliminary injunction analysis. *See Hybritech, 849 F.2d at 1458* ("Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief."). *Hybritech, 849 F.2d at 1458*.

The potential harm to Federal Package has already been discussed. For its part, Tuf-Tite did not address this prong of the analysis in its response brief. However, Tuf-Tite did submit a declaration from Theodore Meyers ("Meyers Declaration"), who averred that an preliminary injunction would cause harm to Tuf-Tite by delaying sales of the INPRES applicator, requiring retooling costs, and damaging Tuf-Tite's industry reputation and customer relationships. Meyers Decl. ¶¶ 9-11. **[*26]**

After weighing the respective harms, the Court finds that the potential harm to Federal Package in the absence of

preliminary injunctive relief outweighs any potential harm that such relief would impose upon Tuf-Tite. This is particularly true here, in light of Federal Package's substantial likelihood of succeeding on the merits of its infringement claim, its prominent position in the lip balm applicator market, and its long-established relationship with Carma. In contrast, Tuf-Tite has only recently entered the market for manufacturing applicator sticks with its INPRES product. Furthermore, at the most recent hearing on November 6, 2014, Tuf-Tite's counsel informed the Court that Tuf-Tite has not found much customer interest in the patented feature and has been selling other products without the feature.

As for the public interest, Federal Package argues that there is none at stake other than the usual interest in protecting patents. Tuf-Tite puts forth no argument to the contrary. Accordingly, the Court finds that issuance of a preliminary injunction will further the public interest in securing patent rights, and this factor favors issuance of injunctive relief.

For these reasons, the **[*27]** balancing of harms favors an award of preliminary injunctive relief to Federal Package.

### IV. Bond

Finally, because the Court is granting Federal Package's motion, it must consider whether to impose an injunction bond upon Federal Package pursuant to *Fed. R. Civ. P. ("Rule") 65(c)*. *Rule 65(c)* provides that the Court may only issue preliminary injunctive relief "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Fed. R. Civ. P. 65(c)*. In this Circuit, intellectual property injunction "bonds must reflect full costs" in order to "hold in check the incentive business rivals have to pursue relief that gives them a competitive edge even if . . . they lose in the end." *Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000)*.

Tuf-Tite contends that, if Federal Package's motion were granted, it would incur approximately $110,000.00 in rehabilitative advertisement costs, $40,000.00 in retooling costs, and an additional $1,000,000 in lost sales to Carma (half of which could be offset by selling other applicators). Meyers Decl. ¶¶ 9-12. Thus, Tuf-Tite urges the Court to impose a bond in the amount of $540,000.00.

In response, Federal Package asks the Court to impose only a "minimal" bond, **[*28]** arguing that Tuf-Tite's request is based upon the mere possibility that Tuf-Tite could sell the INPRES applicator to Carma, while Federal Package has produced a second declaration from Steven R. Dakolios ("2d Dakolios Decl."), the President of Federal Package Network Inc., averring that Carma does not intend to purchase any lip balm applicators from Tuf-Tite. 2d Dakolios Decl. ¶ 3. Federal Package further points out that Tuf-Tite has not identified any other potential customers for the INPRES applicator at this time. Def.'s Reply at 15. It does not contest the other assertions made by Meyers.

The Seventh Circuit's guidance in *Mead Johnson* was that in "setting the amount of security, district courts should err on the high side." *201 F.3d at 888*. Here, the Court finds that a bond in the amount of $250,000.00 is sufficient to protect Tuf-Tite's interests. In arriving at this figure, the Court credits Meyers' uncontroverted statements that Tuf-Tite would incur costs of approximately $150,000.00 for retooling and rehabilitative advertising. As for lost profits, in light of the well-established relationship between Federal Package and Carma (and, indeed, Carma's part in the development of the invention), **[*29]** the Court finds Tuf-Tite's conclusory assertion that it will be able to usurp Federal Package as Carma's supplier neither credible nor persuasive. Furthermore, as noted above, to date, Tuf-Tite has not found any significant market interest in the INPRES applicator. Accordingly, the Court finds that a significant discount of Tuf-Tite's anticipated sales estimate in the order of 75% is appropriate, while still keeping the resulting figure "on the high side." The Court therefore orders that Federal Package post a bond in the amount of $250,000.00 within fourteen days of this order.

## Conclusion

For the foregoing reasons, the Court grants Defendant Federal Package Networks, Inc.'s Motion for Preliminary Injunction [dkt. 18]. Defendant is directed to meet and confer with Plaintiff Tuf-Tite, Inc. and to provide the Court with a proposed order within three [3] days of this Order consistent with the Court's holding herein. Pursuant to *Fed. R. Civ. P. 65(c)*, Federal Package is further directed to post a bond in the amount of $250,000.00, within fourteen days of this Order.

SO ORDERED

ENTERED: 11/21/14

/s/ John Z. Lee

John Z. Lee

United States District Judge

**End of Document**